THOMAS O. HOLSTEIN, Plaintiff-Appellant, v. RICHARD J. GROSSMAN *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—90—3470

Opinion filed February 8, 1993.—Rehearing denied June 18, 1993.—
Supplemental opinion filed July 6, 1993.

720

Michael Long and Thomas O. Holstein, *pro se*, both of Chicago, for appellant.

Richard J. Grossman and Steinberg, Burtker & Grossman, Ltd., of Chicago, appellees *pro se*.

JUSTICE BUCKLEY delivered the opinion of the court:

In July 1981, plaintiff-attorney Thomas Holstein allegedly entered an oral fee-referral agreement with defendants attorney Richard Grossman (Grossman) and his law firm, now named Steinberg,

Burtker & Grossman, Ltd. (SB&G). Under the claimed agreement, plaintiff was to refer personal injury cases to SB&G in exchange for a one-half share of any attorney fees which defendants might receive. Plaintiff claims to have subsequently referred 10 cases to defendants and to have received a 50% referral fee on five of the cases.

Plaintiff alleges that defendants secretly settled referred cases refusing thereafter to pay plaintiff any referral fees. Plaintiff thereafter filed a two-count complaint which sought an accounting from defendants on all referred cases and judgment in his favor for past-due referral fees. Cross-motions for summary judgment were filed, and the circuit court, finding that the oral agreement amounted to nothing more than unethical lawyer brokering violative of public policy, granted defendants' motion. On appeal, plaintiff requests this court to vacate the summary judgment award and instruct the circuit court on remand to enter summary judgment in his favor.

Plaintiff and defendant Grossman are licensed Illinois attorneys with plaintiff primarily practicing bankruptcy law and Grossman concentrating in personal injury law. Plaintiff, as part of his law practice, operates "LAWLINE," a telephonic information service which offers its callers free legal advice from licensed attorneys and an intra-attorney referral service. LAWLINE is subsidized by referral fees.

In July 1981, plaintiff claims that he and Grossman discussed the creation of a referral arrangement in which plaintiff would refer personal injury claimants from time to time to defendants in exchange for a referral fee. During the meeting, plaintiff and Grossman reviewed Rule 2—107 of the Illinois Code of Professional Responsibility (107 Ill. 2d R. 2—107) to insure that their fee-referral agreement complied with all ethical obligations.

Following their review, plaintiff claims that he and Grossman entered the following oral agreement: (1) in exchange for a one-half share of attorney fees which defendants may ultimately receive, plaintiff would refer personal injury claimants to defendants from time to time; (2) defendants would primarily pursue settlement or litigation of the claimants' claims; (3) plaintiff would assume responsibility for the referred clients as if he were a partner of SB&G; (4) defendants would make written disclosure of the parties' forwarding-fee agreement to referred clients in accordance with Rule 2—107; and (5) no fee collected would exceed a reasonable fee.

Plaintiff subsequently drafted a "model" attorney-client contract which plaintiff tendered to Grossman and which, according to plaintiff, Grossman bound defendants to use. Under the contract, the following disclosures were to be made to the referred client:

"6. I acknowledge, understand and agree that initially I consulted with Attorney(s) for 'LAWLINE,' owned and operated by Attorney Thomas Holstein, who, after evaluating the facts of my case, referred me to this law firm. Referring Attorney(s) will monitor my case from time to time, and assume full responsibility for the performance of the services described herein. Referring attorney(s) shall be listed on all disclosure affidavits and liens, if any, filed with any court by attorney above and may appear as co-counsel when appropriate.

My attorney will make a division of fees of 50% of the attorneys' fees received with the referring attorney(s) when and if any fee is realized. Attorney above represents and agrees that any fee for services herein is reasonable in nature for said legal services and does not exceed reasonable compensation for services to be performed for the benefit of the Client herein named below."

Plaintiff alleges that the parties thereafter began performing under their agreement. Plaintiff claims to have referred 10 cases to defendants and received referral fees on five of those cases. The cases upon which referral fees were paid are not involved in this appeal.

The instant dispute began when plaintiff learned that defendants had secretly settled referred cases and failed to pay plaintiff any referral fee. When defendants refused to discuss the matter, plaintiff filed a complaint which, in its present form, alleges that defendants are in breach of contract and have also breached a joint-venture agreement. This latter theory is predicated on defendants' breach of fiduciary duties to plaintiff, including the duties of good faith and loyalty. Plaintiff alleges that defendants owe plaintiff over $50,000 on the remaining five cases.

Defendants subsequently moved for summary judgment asserting that the alleged fee-referral agreement violated Rule 2—107 of the Illinois Code of Professional Responsibility and was therefore illegal and unenforceable. Defendants cited to the following actions or inactions by plaintiff which allegedly violated Rule 2—107: (1) plaintiff never had an attorney-client relationship with any referred client and never disclosed the parties' arrangement to the referred clients prior to any referral; and (2) no referred client ever signed the model contract plaintiff had prepared; rather, the referred clients only signed a standard SB&G contingency contract which contained no disclosures whatsoever regarding the parties' arrangement.

Defendants contended alternatively that even if plaintiff had an attorney-client relationship with the referred clients, his failure to

fully disclose the parties' fee-referral arrangement to his "clients" violated his fiduciary duty to them. Defendants contended further that plaintiff's fiduciary duty and Rule 2—107 prohibited any delegation of plaintiff's disclosure obligations.

As evidentiary support for their position, defendants presented the circuit court with the affidavits of Flynn and Bronson, two referred clients with large settlements, stating that they only hired Grossman by written contingency fee agreement; that neither hired plaintiff at any time to represent them in any matter; and that no one ever disclosed at any time that plaintiff would share in any fee or undertake any responsibility for their respective cases.

Defendants further directed the circuit court to plaintiff's deposition testimony. In his deposition, plaintiff stated that he could not recall ever meeting personally or speaking directly with Danny Flynn, the referred client. Rather, due to plaintiff's prior relationship with Danny's brother, Timothy, plaintiff was retained by Timothy Flynn or the Flynn family on Danny's behalf, and all disclosures were made to the Flynn family. As for the other referred clients in question, plaintiff's deposition testimony is that he only generally recalls speaking to each client, being retained and making full disclosure to each. Plaintiff rested his belief not on any specific meeting which he could recall in detail, but rather on a general belief that a certain procedure was followed in his office by all attorneys in his office, including himself.

Plaintiff responded to defendants' motion with a motion for summary judgment directed at count II of his complaint. In support of his motion, plaintiff asserted that he and defendants had entered a joint-venture agreement; that the agreement was ethical when entered; that defendants owed plaintiff a fiduciary duty with respect to joint-venture matters; that defendants breached their fiduciary duty by omitting plaintiff from the contingency agreements into which the referred clients entered and by failing to account for money received in settled cases; and that defendants should be estopped from raising Rule 2—107 as a defense because it was their conduct, not plaintiff's, which caused any violation of the rule.

In evidentiary response to defendants' summary judgment motion, plaintiff submitted an affidavit pursuant to Supreme Court Rule 191(b) (134 Ill. 2d R. 191(b)) stating that, because of hostility, he is unable to procure affidavits from individuals who would corroborate his testimony that all referred clients were first retained by him, fully informed of the fee splitting agreement and consented to the referral and fee splitting arrangement prior to their **referral.**

Plaintiff also submitted an affidavit from Timothy Flynn reflecting that, because of his brother's significant injury, he retained plaintiff on his brother's behalf, and on behalf of James Bronson, another referred client, who was also injured at the same time as Daniel Flynn.

At the hearing of the parties' respective motions, the court made a factual assumption that a fee-referral agreement existed between the parties in which they agreed to share equally any fees which defendants might receive on referred cases. The court also refused to consider any of plaintiff's nonparty affidavits in view of their noncompliance with certain provisions of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 1—101 *et seq.*). Plaintiff has not appealed this ruling.

Based on the evidentiary matters properly before the court, the court determined that no issue of fact existed as to whether plaintiff had an attorney-client relationship with any of the referred clients or that any oral disclosures took place. The court predicated this determination on the uncontradicted affidavits of Flynn and Bronson, and plaintiff's deposition testimony that he could not specifically recall speaking to any referred client. The court also determined that because the record revealed without dispute that no referred client ever signed a writing disclosing the parties' fee-sharing agreement, the agreement violated Rule 2—107 and public policy and that defendants could properly assert this violation as an affirmative bar to plaintiff's action. Accordingly, the court granted defendants' motion for summary judgment and, correspondingly, denied plaintiff's motion.

On appeal, we need not address whether, as a factual matter, plaintiff had an attorney-client relationship with the referred clients prior to their referral or whether the clients ever received oral disclosure of the parties' arrangement. Rather, we believe it sufficient to affirm the circuit court with respect to count I based on the undisputed fact that no referred client ever consented in writing to the parties' arrangement. For the reasons that follow, we believe that an intra-attorney fee-sharing agreement which is primarily based on a client referral is unenforceable as a matter of public policy where the undisputed facts show that the referred client never consented in writing to the attorneys' arrangement.

As a general rule, courts will not enforce a private agreement which is contrary to public policy. (*O'Hara v. Ahlgren, Blumenfeld & Kempster* (1989), 127 Ill. 2d 333, 341, 537 N.E.2d 730, 734; see generally 12 Ill. L. & Prac. *Contracts* §163 (1983).) While the term

"public policy" lacks precise definition, it may be stated generally as a legal principle that no one may lawfully do that which has a tendency to injure the public welfare. (*O'Hara*, 127 Ill. 2d at 341, 537 N.E.2d at 734.) The public policy of this State is reflected in its constitution, its statutes and its judicial decisions. (*O'Hara*, 127 Ill. 2d at 341, 537 N.E.2d at 734.) The question of whether a contract is enforceable under considerations of public policy is a conclusion of law (*Zeigler v. Illinois Trust & Savings Bank* (1910), 245 Ill. 180, 91 N.E. 1041) and turns on the particular facts and circumstances of each case. *O'Hara*, 127 Ill. 2d at 341-42, 537 N.E.2d at 734.

Our courts apply a strict test in determining whether a contract violates public policy. (*Schniederjon v. Krupa* (1985), 130 Ill. App. 3d 656, 659, 474 N.E.2d 805, 808.) A court, therefore, will not declare a contract illegal unless it expressly contravenes the law or a known public policy of this State. (*Schniederjon*, 130 Ill. App. 3d at 659, 474 N.E.2d at 808.) Public policy itself strongly favors freedom to contract. *McClure Engineering Associates, Inc. v. The Reuben H. Donnelley Corp.* (1983), 95 Ill. 2d 68, 72, 447 N.E.2d 400, 402; *Schniederjon*, 130 Ill. App. 3d at 659, 474 N.E.2d at 808.

The Illinois Supreme Court adopted the Illinois Code of Professional Responsibility (the Illinois Code) on June 3, 1980, effective July 1, 1980 (107 Ill. 2d art. VIII, Committee Commentary, at 604), thereby establishing the first "official" guideline for the professional conduct of Illinois attorneys. Prior to the adoption of the Illinois Code, special committees of the Illinois State and Chicago Bar Associations, acting under the auspices of the supreme court, were responsible for investigating, prosecuting and hearing disciplinary complaints brought against Illinois lawyers. (Vernon, *The Illinois Code of Professional Responsibility: A Blueprint for Disciplinary Enforcement*, 30 De Paul L. Rev. 365, 365-66 (1981) (hereinafter Vernon); see 50 Ill. 2d R. 751.) The bar organizations acted in this capacity until 1973, when the Illinois Supreme Court's Attorney Registration and Disciplinary Commission was created. Vernon, 30 De Paul L. Rev. at 384-85; see 58 Ill. 2d R. 751.

Both before and after 1973, Illinois attorneys seeking ethical guidance in their practices turned to the ethical codes passed by the American, Chicago and Illinois State Bar Associations. The bar organizations' codes, while not binding on the Illinois Supreme Court, "constitute[d] a safe guide for professional conduct and an attorney may be disciplined for not observing them." See *In re Kutner* (1975), 78 Ill. 2d 157, 164, 399 N.E.2d 963, 965; *In re Taylor*

(1977), 66 Ill. 2d 567, 571, 363 N.E.2d 845, 847; *In re Krasner* (1965), 32 Ill. 2d 121, 129, 204 N.E.2d 10, 14.

In 1978, the Illinois Supreme Court appointed a committee on professional responsibility to make recommendations concerning the adoption of comprehensive rules. The committee responded with a draft code which the Illinois Supreme Court ultimately adopted as the Illinois Code. 107 Ill. 2d art. VIII, Committee Commentary, at 604.

The principal guideline used by the drafters of the Illinois Code was the American Bar Association Model Code of Professional Responsibility (the ABA Model Code) (107 Ill. 2d art. VIII, Committee Commentary, at 604), which the ABA adopted in August 1969 to become effective January 1, 1970. (Sutton, *Symposium—The American Bar Association Code of Professional Responsibility: An Introduction*, 48 Tex. L. Rev. 255, 255 (1970) (hereinafter Symposium).) The ABA Model Code in turn was predicated on the ABA's 1908 Canons of Professional Ethics. Vernon, 30 De Paul L. Rev. at 366 n. 6 (1981); see generally Symposium, 48 Tex. L Rev. 255.

Canon 34 of the original ABA Canons first addressed fee sharing between attorneys. Canon 34 provided:

> "[N]o division of fees for legal services is proper, except with another lawyer based upon a division of service or responsibility." ABA Canons of Professional Ethics, Canon 34 (1965), quoted in *Leoris v. Dicks* (1986), 150 Ill. App. 3d 350, 353, 501 N.E.2d 901, 904.

When the ABA enacted its Model Code, Canon 34 became Disciplinary Rule (DR) 2—107. (*Corti v. Fleisher* (1981), 93 Ill. App. 3d 517, 529, 417 N.E.2d 764, 773-74; Symposium, 45 Tex. L. Rev. 296-97.) Subsequently, when the Chicago Bar and Illinois State Bar Association adopted their own codes, they accepted DR 2—107 of the ABA Model Code without change. (*Corti*, 93 Ill. App. 3d at 529, 417 N.E.2d at 774.) DR 2—107 provided:

> "DIVISION OF FEES AMONG LAWYERS
>
> (A) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his firm or law office, unless:
>
> > (1) The client consents to employment of the other lawyer after a full disclosure that a division of fees will be made.
> >
> > (2) The division is made in proportion to the services performed and responsibility assumed by each.

(3) The total fee of the lawyers does not clearly exceed reasonable compensation for all legal services they rendered the client.

(B) This Disciplinary Rule does not prohibit payment to a former partner or associate pursuant to a separation or retirement agreement." (ABA Model Code, DR 2—107 (1980), quoted in *Corti*, 93 Ill. App. 3d at 529, 417 N.E.2d at 774.)

The companion ethical consideration (EC 2—22) to DR 2—107 provided:

"Without the consent of his client, a lawyer should not associate in a particular matter another lawyer outside his firm. A fee may properly be divided between lawyers properly associated if the division is in proportion to the services performed and the responsibilities assumed by each lawyer and if the total fee is reasonable." ABA Model Code, EC 2—22 (1980), quoted in *Corti*, 93 Ill. App. 3d at 529-30, 417 N.E.2d at 774.

*Corti v. Fleisher* (1981), 93 Ill. App. 3d 517, 417 N.E.2d 764, is the leading pre-Illinois Code case discussing the public policy implications of fee-sharing agreements under the fee-sharing provisions of the various bar codes where the plaintiff-attorney's claim for a fee is based solely on his referral of a client to another attorney.

In *Corti*, the plaintiff-attorney, after being terminated by his law firm-employer, filed suit to recover fees pursuant to a written employment agreement which the parties had entered. The agreement provided "that upon termination of the employment agreement, all files that were directly or indirectly referred to the firm by plaintiff were to become the sole and absolute property of plaintiff and that any future fees derived therefrom were to be remitted to plaintiff." *Corti*, 93 Ill. App. 3d at 519, 417 N.E.2d at 766.

During plaintiff Corti's employ, he became acquainted with an attorney who subsequently referred about 100 personal injury cases to plaintiff's firm. Following plaintiff's termination, the law firm informed plaintiff that the referring attorney had issued written instructions to the firm to maintain personal custody and control of any files he had referred. Plaintiff's employer refused to turn over the files or share in any of the fees. *Corti*, 93 Ill. App. 3d at 519, 417 N.E.2d at 766.

We addressed two issues in *Corti*. First, can an attorney and his law firm agree in advance that upon termination, the employee-attorney shall receive files of cases he indirectly referred to the firm without the client's consent. Second, pursuant to the same

agreement, can the employee-attorney claim all fees generated by the referred files in the absence of the performance of legal services or assumption of responsibility. *Corti*, 93 Ill. App. 3d at 520-21, 417 N.E.2d at 767-68.

With respect to the first issue, we referred to the plaintiff's complaint, which contained no allegations that an attorney-client relationship existed between plaintiff and the clients in question or that the clients were aware of and consented to plaintiff's ownership of their files. (*Corti*, 93 Ill. App. 3d at 521, 522, 417 N.E.2d at 768, 769.) The absence of these allegations compelled us to find that part of the agreement requiring transfer of files unenforceable on public policy grounds. We stated:

> "To rule that the instant agreement is enforceable would be tantamount to condoning a lawyer's practice in exchanging clients with another member of the profession without the client's consent. We decline to do so because we believe that each person must have the untrammelled right to the counsel of his choice. A contrary decision would allow clients to be unknowingly treated like objects of commerce, to be bargained for and traded by merchant-attorneys like beans and potatoes." *Corti*, 93 Ill. App. 3d at 523, 417 N.E.2d at 769.

Regarding issue two, we refused to lend approval to an agreement in which the plaintiff-attorney would recover all fees generated by the defendant-law firm without having performed any work on the file in question himself. We stated our public policy objections to this portion of the agreement as follows:

> "In reaching this decision, we have concluded that the agreement is injurious to the best interests of the clients concerned because it reduces the motivation of defendants to use their best efforts in resolving the clients' cases. *** [I]f this agreement were enforceable, defendants would be required under paragraph 15 to perform all the legal work on these files and then to remit all fees to plaintiff who 'earned' them solely by indirectly referring the files to defendants. In our view, it defies common sense to believe that defendants would be inclined to give the clients under these circumstances the same caliber of professional treatment that they would render to a client originating from their office. Defendants, instead, would be encouraged to dispose of the matters as quickly as possible without regard to the clients' best interests, realizing that all fees arising therefrom would accrue to plaintiff, who rendered no services and assumed no re-

sponsibility for the files. We will not lend judicial approval to an agreement of this nature, because it endangers the clients' rights to receive their attorneys' complete care and consideration in the disposition of their legal affairs." *Corti*, 93 Ill. App. 3d at 523-24, 417 N.E.2d at 769-70.

To support our decision on issue two—that public policy rendered unenforceable fee-splitting agreements premised solely on a client referral—we reviewed in *Corti* several Illinois cases which had previously discussed the enforceability of such agreements. (See *Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 324 N.E.2d 417; *Monahan v. Heirich* (1955), 4 Ill. App. 2d 373, 124 N.E.2d 39 (abstract of opinion); *Parker v. Gartside* (1913), 178 Ill. App. 634.) We noted that in each case, the court upheld the agreement, with the common thread running through each case being that an attorney must perform services or exercise some degree of responsibility other than the mere referral of a case before sharing in the fee. *Corti*, 93 Ill. App. 3d at 527, 417 N.E.2d at 772.

Apart from Illinois cases on the subject, we reviewed cases from other jurisdictions which held unenforceable fee-sharing agreements that were based solely on the referral of a client. One such case, *McFarland v. George* (Mo. App. 1958), 316 S.W.2d 662, interpreted the phrase "service or responsibility" as used in Missouri's version of Canon 34, the predicate to DR 2—107. The case arose within the context of an attorney's claim for a portion of a fee based on a referral of a will contest case to another attorney. Because the referring attorney failed to present any evidence showing the assumption and discharge of responsibility in the handling of the will contest, *McFarland* held that the referring attorney violated Missouri's Canon 34 and was, therefore, entitled to no fee. See *Corti*, 93 Ill. App. 3d at 528-29, 417 N.E.2d at 773.

In reaching its conclusion, *McFarland* relied upon the following comments by Henry S. Drinker, author of a book on legal ethics, given in a panel discussion reported in 7 University of Florida Law Review 433, 434 (1954):

" 'It makes the law too much of a business if you are practicing the way you would as a broker. The lawyer is not supposed to get paid for anything but the legal services that he renders, and selling a man a client is not a legal service.' " *Corti*, 93 Ill. App. 3d at 528-29, 417 N.E.2d at 773, quoting *McFarland*, 316 S.W.2d at 671.

*McFarland* concluded with defining the terms "service" and "responsibility" as used in Missouri's version of Canon 34:

" 'The primary meaning of "responsibility" as found in the dictionaries is the state of being answerable for an obligation. [Citation.] The term "responsibility" includes judgment, skill, ability and capacity. [Citation.] Legal responsibility is the state of one who is bound or obliged in law and justice *to do something.* [Citation.] *** The word "responsibility" as used in the rule means the doing of something. Any other meaning would render the rule meaningless.' " (Emphasis in original.) *Corti,* 93 Ill. App. 3d at 529, 417 N.E.2d at 773, quoting *McFarland,* 316 S.W.2d at 671.

Apart from *McFarland,* we discussed in *Corti* opinions rendered by the ABA's Standing Committee on Professional Responsibility which addressed the propriety of dividing fees solely on a referral under DR 2—107 of the ABA Model Code. The ABA opinions, we noted, interpreted that disciplinary rule to prohibit the division of fees based solely on a referral. We further noted that *Palmer v. Breyfogle* (1975), 217 Kan. 128, 535 P.2d 955, a leading case interpreting DR 2—107, reached a similar conclusion. From our review of the law on fee referrals, we concluded:

"It is evident from this review that attorneys have long been ethically and legally prohibited from sharing with other members of the profession fees generated from the disposal of a legal matter when the only 'service' rendered by the claimant attorney is the referral of the case. Profiting from the solicitation of professional employment is injurious to the legal profession and to the public. As the various authorities reveal, this practice is injurious to the legal profession since the public loses confidence in those who treat clients as merchandise in a market place rather than the recipients of the attorneys' skills and abilities. More importantly, the best interests of the clients are jeopardized by the arrangements when it becomes more profitable for attorneys to sell clients than to give them a legal service. The unique terms of the present agreement not only permitted plaintiff to profit from the mere indirect referral of personal injury cases, but also diminished defendants' incentive to provide the clients with the time and effort that their cases merited. As such, the relevant provision in the agreement is contrary to public policy." *Corti,* 93 Ill. App. 3d at 531-32, 417 N.E.2d at 775.

We have discussed *Corti* at length because it represents pre-Illinois Code public policy on the enforceability of intra-attorney fee-sharing agreements where the fee claim is based solely on the re-

ferral of a client between two attorneys. Prior to July 1, 1980, the effective date of the Illinois Code, intra-attorney fee-splitting agreements based solely upon a client referral were unenforceable on public policy grounds. Any split under DR 2—107 of the ABA Code, and its counterparts under the Illinois bar organizations' codes, required that the division be made "in proportion to the services performed and responsibility assumed by each." (ABA Model Code, DR 2—107 (1980).) Absent the performance of some service, for which the mere referral of a client did not qualify, the fee-sharing agreement violated public policy.

When the Illinois Code was adopted, however, the Illinois Supreme Court changed public policy. Rule 2—107 of the Illinois Code now expressly sanctions fee-referral agreements even though the only "service" the referring attorney provides is the mere referral of a client to another attorney:

"Rule 2—107. Division of Fees Among Lawyers

(a) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm, unless

(1) the client consents in a writing signed by him to employment of the other lawyer, which writing shall fully disclose (a) that a division of fees will be made, (b) the basis upon which the division will be made, including the economic benefit to be received by the other lawyer as a result of the division, and (c) the responsibility to be assumed by the other lawyer for performance of the legal services in question;

(2) the division is made in proportion to the services performed and responsibility assumed by each, except where the primary service performed by one lawyer is the referral of the client to another lawyer and (a) the receiving lawyer fully discloses that the referring lawyer has received or will receive economic benefit from the referral and the extent and basis of such economic benefit and (b) the referring lawyer agrees to assume the same legal responsibility for the performance of the services in question as if he were a partner of the receiving lawyer; and

(3) the total fee of the lawyers does not exceed reasonable compensation for all legal services they rendered to the client.

(4) For purposes of this rule, 'economic benefit' shall include (a) the amount of participation in the fee received

with regard to the particular matter; (b) any other form of remuneration passing to the referring lawyer from the receiving lawyer, whether or not with regard to the particular matter; and (c) an established practice of referrals to and from or from and to the receiving lawyer and the referring lawyer." 107 Ill. 2d R. 2—107.[1]

The Illinois Supreme Court's motivation to depart from the prior prohibition against fee-referral agreements was that attorneys discovered ways around the blanket prohibition. This end run, however, had just as serious public policy implications as those justifying the blanket prohibition in the first place. As the Committee Comments to Rule 2—107 indicate:

"The rule expands and attempts to clarify the ABA provisions respecting division of fees among lawyers. In particular, it expressly sanctions payment of a fee to the referring lawyer where that lawyer takes no part in the actual handling of the case—a practice which is apparently prohibited by the ABA rule—so long as the referring lawyer assumes responsibility for the work of the other as though he were the other's partner, and the total fee of the lawyers does not exceed reasonable compensation for the legal services performed. * * *

To require actual participation in a case before a fee may be earned discourages some lawyers from referring cases they know could be better handled by another. This is not in the interest of the client or the lawyer. Currently, referring lawyers are sometimes given make-work tasks after referral to 'earn' a fee. This practice does not encourage the efficient delivery of legal services and may drive up legal fees. The public is best served by encouraging lawyers to refer matters to those more skilled in a particular area by permitting them to earn a referral fee so long as there is full disclosure to the client and responsibility is maintained by the referring lawyer." 107 Ill. 2d R. 2—107, Committee Comments, at 625.

While Rule 2—107 of the Illinois Code removed the outright prohibition against fee sharing based solely on a client referral, the supreme court's sanctioning of such conduct was not without significant safeguards designed to protect the client. In *Corti*, we ex-

---

[1]The Illinois Code was repealed effective August 1, 1990, by the Illinois Supreme Court and replaced by the Illinois Rules of Professional Conduct. (See 134 Ill. 2d art. VIII.) Rule 2—107 of the Illinois Code is now codified in substantially the same form as Rules 1.5(f) through (j) of the new Code.

pressed that the actual effect of fee-sharing agreements on the clients themselves was our paramount concern. The rule's significant safeguards demonstrate this continued judicial concern.

Under DR 2—107 of the ABA Code, which again prohibited fee sharing based solely on a referral, a certain level of client consent was required. DR 2—107 provided that fee sharing amongst attorneys was prohibited unless, in part, "the client consents to employment of the other lawyer after a full disclosure that a division of fees will be made." (ABA Model Code, DR 2—107 (1980).) Under Rule 2—107 of the Illinois Code, the theme of client consent has not only been continued, the disclosure requirements upon which such consent must be based have been enhanced. (See 107 Ill. 2d R. 2—107, Committee Comments, at 625 ("Additional language seeks to improve the ABA rule by increasing disclosure to the client ***").) Client consent must also be in writing.

Relative to fee sharing based "primarily" on a client referral under Rule 2—107(a)(2), the signed written disclosure required in subsection (a)(1) must disclose the "extent and basis" of the "economic benefit" which the receiving lawyer has received *or* will receive. (See *Phillips v. Joyce* (1988), 169 Ill. App. 3d 520, 523 N.E.2d 933; Vernon, 30 De Paul L. Rev. at 384-85 (discussing requirements of rule).) Economic benefit is broadly defined under the rule to include not only remuneration the referring attorney is to receive in the referred matter, but also "any other form of remuneration passing to the referring lawyer *** whether or not with regard to the particular matter." 107 Ill. 2d R. 2—107(a)(4).

■■ Based on the above articulated history of Rule 2—107, we believe that the enhanced consent provision and signed writing requirement represent an integral part of the Illinois Supreme Court's public policy trade off which the court struck in giving its official sanction to intra-attorney fee-sharing agreements where the primary service performed by the referring attorney is the referral of a client. Before the rule, the actual effect of fee-sharing agreements on the clients themselves was our paramount concern. This concern, firmly rooted in public policy, required intra-attorney fee-sharing agreements based upon a mere client referral to be held violative of public policy. After the rule, public policy still requires that all such agreements be evaluated with this same concern in mind.

In this case, we are faced with an intra-attorney fee-sharing agreement primarily based on a client referral to which no referred client ever consented in writing. We believe that the signed writing

requirement's significant public policy roots require a holding in this case that plaintiff is entitled to no referral fee. The client's right to counsel of his choosing must be preserved, and the signed writing requirement guarantees this result.

Relying on *Kross v. American Country Insurance Co.* (7th Cir. 1989), 875 F.2d 625, and *Phillips v. Joyce* (1988), 169 Ill. App. 3d 520, 523 N.E.2d 933, plaintiff advocates that we adopt a "substantial compliance" standard when assessing the enforceability of fee-referral agreements. Under this standard, plaintiff asserts that no signed writing should be required. We find *Kross* and *Phillips* distinguishable factually and inapplicable to the present case.

In *Kross*, the court assessed the enforceability of a contingent fee contract for purposes of determining whether plaintiff could maintain a cause of action for intentional interference with contract. Defendant argued that plaintiff's contingent fee agreement was unenforceable because it was not in writing and failed to disclose when expenses were to be deducted as required by Rule 2—106 of the Illinois Code. The court disagreed, finding that the violations of Rule 2—106 were "minor technical deficiencies." We distinguish *Kross* on the grounds that it deals with Rule 2—106 within the context of a claim for intentional interference with contract. We further find *Kross* unpersuasive as its analysis does not adequately address the public policy underpinnings of the Illinois Code.

In *Phillips*, certain individuals hired Phillips in 1982 to represent them in a lawsuit against a financial brokerage firm. They agreed that Phillips would receive as attorney fees one-third of amounts recovered by settlement or verdict. *Phillips*, 169 Ill. App. 3d at 522, 523 N.E.2d at 934.

Phillips subsequently filed an action in State court on behalf of nine individuals and all persons similarly situated. On the same day, defendant Joyce filed a class action in Federal court arising from the same conduct. Joyce then approached Phillips and suggested that Phillips' clients be added to the Federal case and that the two attorneys work together. Phillips and Joyce reached an oral agreement to jointly represent the clients.

Joyce thereafter sent a letter to all class clients informing them that he and Phillips were "jointly representing" their interests and that each client must sign a new contingent fee agreement. The clients signed the new contingency contract. *Phillips*, 169 Ill. App. 3d at 523, 523 N.E.2d at 934-35.

Phillips' complaint alleged that Joyce began actively pursuing the litigation without dividing the work with Phillips, keeping him informed or even returning his phone calls. Phillips also alleged that Joyce prepared and sent to all of the class action clients a new fee agreement which only referred to Joyce as the clients' attorney. The class action was subsequently settled, and Phillips thereafter filed his action against Joyce, seeking the imposition of a constructive trust and an accounting. Joyce moved to dismiss the complaint for failing to state a cause of action. The circuit court granted the dismissal, finding that the agreement violated Rule 2—107 of the Illinois Code. *Phillips*, 169 Ill. App. 3d at 523-24, 523 N.E.2d at 934-35.

On appeal, we adopted a standard of substantial compliance in applying Rule 2—107 to attorney fee-referral agreements. (*Phillips*, 169 Ill. App. 3d at 531, 523 N.E.2d at 939.) Under this standard, plaintiff stated a cause of action: The clients on whose behalf Phillips filed the State court action retained him, not Joyce, in the first instance. Although unclear from the opinion, most, and perhaps all, of these clients executed new fee agreements consenting to the joint representation. Although the clients were not informed that Joyce and Phillips were making a 50/50 split of fees, work or responsibility, the letter Joyce sent to the clients informed them that he and Phillips were "jointly representing" their interests. *Phillips*, 169 Ill. App. 3d at 530, 523 N.E.2d at 939.

We find *Phillips* factually distinguishable because there, the clients consented in writing to the joint representation of Phillips and Joyce. No such written consent occurred here. Absent such written consent, there can be no substantial compliance. We distinguish *Phillips* on this ground.

Plaintiff next asserts that SB&G and Grossman should be estopped from asserting the unenforceability of the fee-sharing agreement because it was their conduct in not obtaining the signed writing as promised. Plaintiff asserts that " '[d]isciplinary Rule 2—107 should not be too readily construed as a license for attorneys to break a promise, go back on their word, or decline to fulfill an obligation, in the name of legal ethics.' " *Phillips*, 169 Ill. App. 3d at 535, 523 N.E.2d at 942, quoting *Baron v. Millinax, Wells, Mauzy & Baab, Inc.* (Tex. App. 1981), 623 S.W.2d 457, 462; see also *Watson v. Pietranton* (W. Va. 1987), 364 S.E.2d 812; *Carter v. Katz, Shandell, Katz & Erasmous* (1983), 120 Misc. 2d 1009, 465 N.Y.S.2d 991; *Moran v. Harris* (1982), 131 Cal. App. 3d 913, 182 Cal. Rptr. 519 (endorsing estoppel argument).

■ We reject plaintiff's argument. In *O'Hara v. Ahlgren, Blumenfeld & Kempster* (1989), 127 Ill. 2d 333, 537 N.E.2d 730, our supreme court rejected a similar estoppel argument. There, a widow sought to enforce a fee-sharing agreement with a law firm. The widow and the law firm had agreed for the widow to turn over her deceased husband's cases in exchange for the firm paying her a portion of fees received. To counter the court's holding that the agreement was unenforceable on public policy grounds, the widow argued that she was not in *pari delicto* and that the firm should be estopped from asserting illegality. The court disagreed on both counts and held the agreement to be unenforceable.

Here, plaintiff is no better off than the widow in *O'Hara*. The public policy considerations which the court in *O'Hara* relied upon are as strong in this case. Our paramount concern must be the effect these fee-sharing agreements have on the clients, not the attorneys involved. "It does not matter whose ox is gored." (*Schniederjon v. Krupa* (1987), 162 Ill. App. 3d 192, 195, 514 N.E.2d 1200, 1202.) We will not enforce a fee-sharing agreement which violates public policy. Accordingly, we affirm the circuit court's grant of summary judgment against plaintiff on count I of his complaint.

We next address whether the circuit court properly granted summary judgment against plaintiff on count II of his complaint. While count I of plaintiff's complaint asserts breach of contract against defendants, count II asserts breach of fiduciary duty. Count II posits that the parties' arrangement constituted a joint venture. At the summary judgment hearing, the circuit court made no specific finding relative to whether a joint-venture relationship existed. Nevertheless, summary judgment against plaintiff was entered on this theory because the court believed that the entire agreement was void as against public policy as no client ever consented in writing to the parties' arrangement.

On review, we must first determine whether a genuine issue of material fact exists relative to whether the parties' arrangement can properly be characterized as a joint venture and, if so, whether defendants can assert as an affirmative bar their alleged failure to obtain the referred clients' consent to the referral arrangement.

■ Generally, a joint adventure is an association of two or more persons to carry out a single enterprise for profit. (23 Ill. L. & Prac. *Joint Adventures* §2 (1979).) The existence of a joint venture may be inferred from facts and circumstances showing such an enterprise was in fact entered into and the intent of the parties is the most significant element. (*Ambuul v. Swanson* (1987), 162 Ill.

App. 3d 1065, 1068, 516 N.E.2d 427, 429.) In general, the following elements are determinative of such an intent: (1) an express or implied agreement to carry on some enterprise; (2) a manifestation of intent by the parties to be associated as joint venturers; (3) a joint interest as shown by the contribution of property, financial resources, effort, skill or knowledge by each joint venturer; (4) some degree of joint proprietorship or mutual right to exercise control over the enterprise; and (5) provision for the joint sharing of profits and losses. *Ambuul*, 162 Ill. App. 3d at 1068, 427 N.E.2d at 429.

Where the relationship is established, a fiduciary duty exists between joint adventurers, requiring good faith between them. "Each member *** has the duty to act for the benefit of the others as to matters within the scope of the relation." (23 Ill. L. & Prac. *Joint Adventures* §21 (1979).) "Each party is required to make a complete disclosure to the other of all matters affecting their enterprise. Each party is entitled to a formal account as to the operations and affairs of the joint adventure, and each party is liable to the other for misrepresentation or other fraud in the course of the enterprise." 23 Ill. L. & Prac. *Joint Adventures* §21 (1979).

Recently, in *In re Johnson* (1989), 133 Ill. 2d 516, 552 N.E.2d 703, our supreme court addressed whether a joint-venture relationship could arise between an attorney and a law firm which the client retained to jointly represent his case. There, Johnson agreed to represent Walter Geldzahler in connection with a claim on a disability insurance policy. Johnson asked Moore, another attorney, to join him in representing Geldzahler. Geldzahler entered into a written contingent fee retainer agreement whereby he jointly retained the respondent and Moore's law firm, Kelly & Moore, on a one-third contingency basis. Johnson and the firm orally agreed to a one-half division of the attorney fee. The case subsequently settled, with Johnson receiving a settlement check in the names of Johnson, the client and Kelly & Moore. Johnson later negotiated the check in his own name and in the name of Kelly & Moore.

On review, the court addressed the issue of whether Johnson's relationship with Kelly & Moore vested him with implicit authority to negotiate the settlement check in their name despite lacking express authority to so act. The court stated:

> "Although the precise issue has not been previously addressed by this court, it appears well accepted in other jurisdictions that where lawyers between whom no general partnership relation exists jointly undertake to represent a client in a case, they may be regarded as joint venturers, or 'spe-

cial partners,' for the particular transaction. [Citations.] 'Thus, where an attorney retained on a contingent fee to prosecute a claim engages another lawyer to assist in the litigation, upon an agreement to share the fee in case of success, otherwise to receive nothing, they become joint venturers.' [Citations.] We accept this characterization of the relationship between two attorneys, like [Johnson] and the firm of Kelly & Moore in the present case, jointly representing a client on a contingent fee basis. This court has defined a joint venture as an association of two or more persons to carry out a single enterprise for profit. [Citations.] This definition aptly characterizes the relationship between the respondent and the firm of Kelly & Moore with regard to the representation of Walter Geldzahler." (*In re Johnson*, 133 Ill. 2d at 525-26, 552 N.E.2d at 707.)

The court went on to hold that the parties' relationship vested Johnson with implicit authority to endorse the settlement check in the name of Kelly & Moore.

█ We believe that *Johnson* is persuasive authority for the proposition that a genuine issue of material facts exists as to whether the relationship between plaintiff and defendants in the instant case constituted a joint-venture relationship. First, a jury could find that the parties entered "some" enterprise. Documentary evidence from defendants to plaintiff exists in which defendants thank plaintiff for the referral of 10 cases. Other record evidence indicates checks from defendants to plaintiff. Plaintiff asserts that these checks reflect payment of his referral fee in five of the referred cases.

Second, a jury could conclude that the enterprise entered was indeed a joint venture. To the venture, plaintiff contributed clients while defendants contributed legal services. A 50/50 sharing of profits was contemplated. Plaintiff claims that he agreed to assume the same responsibility for the services rendered as if he were one of defendants' partners. This shared responsibility gave plaintiff "some degree of joint proprietorship or mutual right to exercise control over the enterprise" (*Ambuul*, 162 Ill. App. 3d at 1068, 516 N.E.2d at 429), even though the parties agreed that plaintiff would not in fact exercise any.

Assuming the trier of fact on remand finds a joint-venture relationship, the trier of fact could further find that defendants breached their fiduciary duties to plaintiff. A jury could find from the evidence that, soon after entering the alleged fee-sharing ar-

rangement with plaintiff, defendants failed to obtain the referred clients' signatures on the model contract as agreed. Instead, defendants signed the referred clients, with whom otherwise they would have had no contact, to their own standard contingency contract, omitting plaintiff entirely. A jury could find from this evidence that defendants breached their fiduciary duties of loyalty and good faith to plaintiff.

We must next address whether the undisputed absence of Rule 2—107's signed writing requirement necessitates that the parties' joint-venture agreement be held unenforceable on public policy grounds. We think not.

Plaintiff's count I sought enforcement of the fee-sharing agreement. Because no referred clients ever consented in writing, we held that allowing plaintiff to obtain a fee in such instance would violate public policy. This holding was predicated on Illinois public policy, which requires that the client's right to representation by the attorney of his choosing be preserved. The effect of such fee-sharing agreements on the clients involved was our paramount concern.

Plaintiff's count II deals with the fiduciary duty one attorney owes to another upon entering a joint-venture agreement in which clients are referred and fees shared. Breach of fiduciary duty actions are not contract actions. This distinction, we believe, requires that our paramount concern becomes the effect such agreements have on the attorneys involved.

It is clear that Illinois public policy cannot endorse defendants' alleged misconduct in this case. Receiving attorneys cannot be allowed to induce a referring attorney to make a referral under the belief that the receiving attorney will obtain Rule 2—107's signed writing requirement. Clearly, the profession will be better served if attorneys are bound to their word.

Finally, we note that the result we reach on count II comports with the framework of Rule 2—107. Contrary to defendants' assertions, Rule 2—107 did not require plaintiff, as the referring attorney, to have an attorney-client relationship with the referred clients prior to referral. (Accord *Ryder v. Farmland Mutual Insurance Co.* (1991), 248 Kan. 352, 807 P.2d 109 (interpreting the word "client" to mean the status of the client with regard to the receiving attorney, not the referring attorney).) Rather, relative to retention, the plain language of the rule requires only that the client consent in writing to the retention of both attorneys prior to a fee division.

Nor does the rule *require* the referring attorney to obtain the signed writing containing the necessary disclosures prior to the referral. Rule 2—107(a)(2) specifically states that "the *receiving lawyer fully disclose*[ ] that the referring lawyer has received or will receive economic benefit from the referral and the extent and basis of such economic benefit." (Emphasis added.) (107 Ill. 2d R. 2—107(a)(2).) Given this structure of the rule, the referring and receiving attorney may agree in advance as the parties allegedly did here as to who shall obtain the signed writing required by the rule. Of course, absent the signed writing, no fee-sharing agreement is enforceable on contractual grounds. Consequently, the referring attorney may wish to obtain the signed writing prior to the referral, but under the rule, such a result is not required.

In summary, as to count II, we reverse and remand the circuit court's award of summary judgment against plaintiff.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed in part and reversed in part and remanded for further proceedings consistent with this opinion.

Affirmed in part, reversed in part and remanded.

MANNING, P.J., and O'CONNOR, J., concur.

SUPPLEMENTAL OPINION ON DENIAL OF REHEARING

JUSTICE BUCKLEY delivered the opinion of the court:

Defendants' petition for rehearing raises numerous arguments which we believe warrant discussion.

Defendants first argue that our finding of unenforceability as to count I requires that plaintiff's recovery under count II be barred as well. We disagree.

■ In our opinion, we found that Rule 2—107 (107 Ill. 2d R. 2—107) does not require a referring attorney to have an attorney-client relationship with the referred client prior to the referral. Also, we found that Rule 2—107 does not require the referring attorney to obtain the signed writing containing the necessary disclosures prior to the referral. These findings were based on the plain language of Rule 2—107.

These two observations are of critical importance in this case. Plaintiff has alleged that he and Grossman sat down together and developed their arrangement after reading Rule 2—107. Their arrangement envisioned total compliance with that rule. Because

plaintiff did not practice personal injury law, personal injury claimants would be referred to Grossman and his firm where they would sign a model retainer contract. This contract disclosed to the client, *inter alia*, that plaintiff would receive a referral fee and the nature and extent thereof. We agree with plaintiff that the alleged agreement envisioned compliance with Rule 2—107.

This conclusion in turn bears directly on the viability of plaintiff's count II, which asserts that the relationship entered between the parties constituted a joint venture and that defendants' conversion of the referred clients amounted to a breach of fiduciary duty. Unlike count I, plaintiff's recovery under count II does not require this court to enforce an agreement which is unenforceable on public policy grounds. As to that count, if this court were to enforce the parties' alleged agreement, we would be enforcing a fee-sharing agreement to which the referred clients never consented in writing. The signed writing requirement is firmly rooted in public policy and, in its absence, no fee-sharing agreement is enforceable on contract grounds.

However, as to count II, this court need only find that the parties' alleged agreement initially envisioned compliance with the applicable ethical rules. We believe, as noted, that it did. A joint venture, valid when entered, gives rise to fiduciary duties between its members. A subsequent breach of fiduciary duty, which by its nature just so happens to render the underlying agreement unenforceable on public policy grounds, does not destroy the existence of the underlying agreement. It exists as do the fiduciary duties arising therefrom. Thus, a breach of fiduciary duty action may nevertheless lie. For these reasons, defendants' argument that count I and II must rise and fall together fails.

■ Defendants also raise the argument that plaintiff's recovery under count II is barred because plaintiff breached his own fiduciary duty to the referred clients. Defendants assert that plaintiff has alleged an attorney-client relationship with each referred client. Relying on *Schniederjon v. Krupa* (1987), 162 Ill. App. 3d 192, 514 N.E.2d 1200, defendants assert that plaintiff had a fiduciary duty to make full disclosure of the parties' arrangement to each referred client. Defendants assert that, absent such disclosure, plaintiff is not entitled to share in any fee.

Our review of plaintiff's verified, fourth-amended complaint reveals that plaintiff indeed alleges the existence of an attorney-client relationship with each referred client prior to referral. Plaintiff asserts: "[He] reviewed the facts surrounding the aforesaid claims

with the claimants, analyzed the law applicable to the facts, evaluated the merits of each claim and accepted the offer to be retained by the client."

*Schniederjon* holds that attorneys have a fiduciary duty to their clients to make full disclosure of fee-sharing agreements. We agree with *Schniederjon* that this duty arises apart from Rule 2—107 and the ethical rules; it arises pursuant to common law. "Generally, an attorney .is required to disclose to his clients all facts and circumstances within his knowledge which might be likely to affect the performance of his duty." (4 Ill. L. & Prac. *Attorneys and Counselors* §104 (1971).) As *Schniederjon* noted: "We need not comment about the difference in the financial inducement between a one-third and one-sixth fee." (*Schniederjon*, 162 Ill. App. 3d at 195, 514 N.E.2d at 1202.) Clearly, an attorney's fiduciary duty to his client includes full disclosure of the existence and nature of any fee-sharing agreement.

We agree with defendants' assertion that *Schniederjon* acts to bar plaintiff's recovery where plaintiff has failed to make full disclosure of his fee-referral agreement to his own clients. We will not aid an attorney in recovering a referral fee where that attorney has himself breached his fiduciary duty to the referred client. This is so whether the referring attorney seeks recovery of a portion of the fee itself or whether the fee sought is labelled a "profit" of a claimed "joint venture."

Our agreement with defendants, however, does not entirely bar plaintiff's recovery here. This case is an appeal from a summary judgment. Thus, we must construe the evidence produced on defendants' motion in the light most favorable to plaintiff. Upon doing so, we believe there exists a genuine issue of material fact as to the referral of Danny Flynn to defendants.

The relationship of attorney and client is a contractual one. (*Corti v. Fleisher* (1981), 93 Ill. App. 3d 517, 521, 417 N.E.2d 764, 768.) It is only created by a retainer or an offer to retain or fee paid. It cannot be created by the attorney alone or by an attorney and a third party who has no authority to act. (*Corti*, 93 Ill. App. 3d at 521, 417 N.E.2d at 768.) Implicit within *Corti* is the principle that a third party *with* authority from another *can* create an attorney-client relationship for the benefit of the other.

Plaintiff's deposition illustrates the very real situation of family members retaining an attorney to pursue a personal injury matter on behalf of an injured family member. Plaintiff was Timothy Flynn's friend and had acted as his attorney in a workers' compen-

sation case. Plaintiff there had a 50/50 relationship with another attorney.

Plaintiff testified that Timothy called him from the hospital where Danny had been brought following an automobile accident in which Danny and James Bronson, another referral, were injured. Timothy wished to hire plaintiff on Danny's behalf. Because of plaintiff's relationship with Timothy Flynn, the Flynns generally knew, including Danny Flynn, of plaintiff's 50/50 arrangement with other personal injury attorneys. At the time of the accident, plaintiff again explained his arrangement to the Flynn family.

Plaintiff testified that he recalled that he arranged a conference call between himself, Grossman and Timothy Flynn. Timothy Flynn was supposed to go to Grossman's office and obtain the model retainer agreement for Danny to sign. Timothy Flynn did obtain paperwork from Grossman. However, it was Grossman's standard-form contingency contract. This is the contract which Danny Flynn signed. Apparently, Timothy Flynn delivered to Bronson at this time a similar retainer contract for Bronson to sign as well. It was not until after settlement of the cases involving these individuals did plaintiff first learn that he had been excluded by Grossman from the Flynn case. Plaintiff testified he was at a bar having drinks with Timothy Flynn when Flynn joked that plaintiff could at least have taken him out to dinner in light of Danny's case being settled. Up to that point, plaintiff believed Grossman was living up to his part of the bargain and, indeed, had even received referral fees from Grossman on other referrals.

We recognize that defendants have submitted the affidavit of Danny Flynn in which he swears, *inter alia*, that "at no time prior to or after signing of this [Grossman retainer] Agreement did Thomas Holstein or any body on his behalf make any representations to me that would suggest that Thomas Holstein and Richard Grossman were going to split any of the fees Richard J. Grossman received from this case." We also recognize that plaintiff admits in his deposition that he never met with Danny Flynn at or immediately after the accident for purposes of retention and that he made no disclosures to Danny Flynn at such times. Plaintiff in his deposition, however, claims that Danny Flynn had "absolute knowledge" that plaintiff was to obtain one-half of any fee which Grossman received.

We cannot enter summary judgment against plaintiff where such a conflict in the testimony exists. Suffice it to say that a genuine issue of material fact exists as to whether plaintiff satisfied his

fiduciary duty to Danny Flynn by making disclosures to Timothy Flynn or other family members who, at the time of such oral disclosure, were acting as the authorized agent of Timothy Flynn.

Relative to Bronson, no genuine issue of material fact exists as to whether plaintiff satisfied his fiduciary duty of making full disclosure to Bronson. Plaintiff in his deposition states that he did not know Bronson prior to the accident. Further, he only had a general "belief" of having made oral disclosure to Bronson or a Bronson family member of the parties' fee-referral arrangement. Bronson in an affidavit has denied retaining plaintiff or receiving any disclosure that plaintiff would share in any fees.

Plaintiff failed as a matter of law. An attorney's general belief that the necessary disclosures were made, without more, is insufficient to comply with his fiduciary duty. Some specifics as to where the conversation took place, when it occurred, and what was said are, at a minimum, required to demonstrate compliance.

The same can be said of the other referrals at issue. The record reveals the names of the individuals referred to be Lindsey, Guilotty and Cobb. These referrals were all generated by LAWLINE.

Plaintiff at his deposition had no independent recollection of speaking to these individuals. He believed, however, that pursuant to standard operating procedure, which he and other attorneys in his office followed, the necessary disclosures were made. Otherwise, the referrals to defendants would not have been made. Such disclosures were always made prior to Grossman being contacted.

This is not compliance with a fiduciary duty. "A contrary decision would allow clients to be unknowingly treated like objects of commerce, to be bargained for and traded by merchant-attorneys like beans and potatoes." (*Corti*, 93 Ill. App. 3d at 523, 417 N.E.2d at 764.) This we cannot allow.

In summary, we deny defendants' petition for rehearing. However, their argument that plaintiff breached his own fiduciary duty to the referred clients is well taken. Plaintiff's recovery, if any, is limited to the referral involving Danny Flynn. As to all others, summary judgment in favor of defendants is affirmed. For the foregoing reasons, the case is remanded for further proceedings consistent with this opinion.

Affirmed in part; reversed in part and remanded.

MANNING, P.J., and O'CONNOR, J., concur.