2016 IL App (2d) 150360
No. 2-15-0360
Opinion filed May 10, 2016

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| RICHARD P. NAUGHTON, | ) | Appeal from the Circuit Court |
| | ) | of McHenry County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 10-LA-28 |
| | ) | |
| BRUCE R. PFAFF and PFAFF & GILL, LTD., | ) | Honorable |
| | ) | Thomas A. Meyer, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE SPENCE delivered the judgment of the court, with opinion.
Justice Hudson concurred in the judgment and opinion.
Justice Hutchinson specially concurred, with opinion.

**OPINION**

¶ 1     Plaintiff, Richard P. Naughton, appeals from a grant of summary judgment in favor of

defendants, Bruce R. Pfaff and Pfaff & Gill, Ltd.  Naughton argues that the trial court erred in

ruling that an attorney who refers an individual to another attorney may not prevail on a claim of

breach of fiduciary duty against the receiving attorney if the client did not sign a contract

complying with Illinois Rules of Professional Conduct Rule 1.5(f) (eff. Aug. 1, 1990).  We

affirm.

¶ 2                                  I. BACKGROUND

¶ 3     Naughton filed a complaint on January 19, 2010, alleging as follows.  Both he and Pfaff

were attorneys.  He was a general practitioner focusing on wills and estate planning, business

incorporation, and similar matters. Pfaff's field of practice was personal injury. Since about 2003, they had a relationship in which Naughton would refer various individuals who had sustained personal injuries to Pfaff as potential clients. In return, Pfaff agreed to pay a referral fee of one-third of any fee Pfaff received from representing a client. As part of the agreement and under Rule 1.5(f), Pfaff agreed and was obligated to prepare and have the client sign a contract detailing that Naughton, as the referring attorney, would receive one-third of any fee generated by the representation. Further, although the two agreed that Naughton would not exercise control over Pfaff's representation of the client, Naughton agreed to assume the same legal responsibility for the performance of Pfaff's services as would a partner of Pfaff's.

¶ 4    Pursuant to this agreement, Naughton referred several individuals to Pfaff as potential clients. For example, in October 2004, Naughton referred a man named S.A.[1] to Pfaff with respect to injuries that S.A.'s father had sustained in an accident. Pfaff accepted the case, and per the agreement with Naughton and Rule 1.5(f), Pfaff detailed in his written retainer agreement that Naughton, as the referring attorney, would receive one-third of the attorney fees generated by the case and that Naughton had agreed to assume the same legal responsibility that Pfaff & Gill had assumed for the performance of legal services. Pfaff settled the case around August 2006 and subsequently sent Naughton a check for his share of the fees generated by the case.

¶ 5    Similarly, in October 2007 Naughton referred an individual named J.K. to Pfaff with respect to personal injuries sustained by J.K.'s son. Pfaff had J.K. sign the same type of written retainer agreement as in the prior case. Pfaff subsequently filed suit, and to Naughton's knowledge, Pfaff continued to represent J.K. in the case.

---

[1] We use initials to refer to certain clients whose names are redacted in parts of the record.

¶ 6    Before March 2003, Naughton had represented his friend, Pete Mateljan, in various legal matters.  In March 2003, he referred Mateljan to Pfaff regarding personal injuries sustained by Mateljan's daughter, Elizabeth Frankenfield, following a medical procedure.  Pfaff declined to accept the case.  In 2006, Mateljan asked Naughton to refer a medical malpractice attorney for injuries sustained by Elizabeth's daughter, Julianna Frankenfield, during Julianna's birth.  Naughton again referred Mateljan to Pfaff.

¶ 7    Based on that referral, Mateljan and Elizabeth met with Pfaff to discuss the case.  At that time, Mateljan told Pfaff that he and Elizabeth had been referred by Naughton.  Pfaff accepted the case, but contrary to his agreement with Naughton and in violation of Rule 1.5(f), he failed to disclose in his written retainer agreement with Elizabeth that Naughton would receive one-third of the attorney fees and had agreed to assume the same legal responsibility as Pfaff & Gill.  Instead, Pfaff presented Elizabeth with the firm's standard retainer agreement.

¶ 8    In early December 2008, Mateljan called Naughton, thanked him for the referral to Pfaff, and said that Pfaff had settled the case for $7.9 million.  Naughton then called Pfaff to confirm the settlement and inquire about the status of the referral fee.  Pfaff confirmed the settlement, which, upon information and belief, generated attorney fees of $1,422,000.  Pfaff said that he was embarrassed by omitting Naughton from the retainer agreement and that he would " 'make it right.' "  He asked Naughton what would be appropriate.  Naughton said that he should receive one-third of the attorney fees, as they had previously agreed.  Pfaff said that his firm had received only an 18% contingency fee for the case and that the referral fee would therefore have to be 18% of the firm's fee.  However, Pfaff later said that Naughton was not entitled to any referral fee, because he was not identified as the referring attorney in Elizabeth's retainer agreement.

¶ 9    Count I of Naughton's complaint alleged breach of contract against defendants for failing to pay him one-third of the attorney fees.    Count II alleged breach of fiduciary duty. Specifically, count II alleged that the agreement between Naughton and Pfaff regarding referrals constituted a joint venture and that Pfaff breached his fiduciary duty to Naughton by failing to include Naughton as the referring attorney in the retainer agreement with Elizabeth.    Naughton requested damages in an amount equal to one-third of the attorney fees generated by Julianna's case.

¶ 10    Naughton attached to the complaint affidavits from Mateljan and Elizabeth.    Mateljan averred as follows, as pertinent here.    Naughton had referred him to Pfaff regarding Julianna's injuries, and but for that referral, Elizabeth would not have hired Pfaff.    Mateljan was present at Elizabeth's home when she retained Pfaff.    At the beginning of that meeting, Mateljan advised Pfaff that Naughton had previously referred him to Pfaff and that they were there because Naughton had again referred them to Pfaff.

¶ 11    Elizabeth averred that she first met with Pfaff when she was referred to him through Mateljan.    When she again needed the services of a medical malpractice attorney, Mateljan asked Naughton if they should again speak to Pfaff.    Elizabeth would not have hired Pfaff if it had not been for Naughton's referral to her father, both initially and for Julianna's medical malpractice case.    The retainer agreement should have included Naughton as the referring attorney, and it should now be amended to indicate this information, as Naughton was the reason she retained Pfaff.    She understood that any referral fee paid to Naughton would be paid by Pfaff and would not cost her or Julianna's estate any money.

¶ 12   On April 21, 2010, defendants moved to dismiss the complaint. On July 20, 2010, Naughton voluntarily dismissed count I, and the trial court denied the motion to dismiss as to count II.

¶ 13   Defendants filed an answer to the complaint on October 21, 2010. They admitted that Naughton referred some clients to Pfaff whom Pfaff agreed to represent. They further admitted that they had distributed attorney fees to Naughton in accordance with the fee agreement signed by S.A.'s father and that J.K. had signed a similar fee agreement. They denied that the fee arrangements were per any generalized agreement. Defendants admitted that Mateljan called Pfaff on February 2, 2003, for a potential case regarding Elizabeth, and that Mateljan said that Naughton had referred him to Pfaff. Defendants declined to represent Elizabeth in June 2003. Defendants admitted that they later agreed to represent Julianna. They agreed that after the case settled they received a reduced 18% contingency fee and that Naughton demanded that they pay him one-third of their fee. They denied that they ever offered any payment to Naughton for the case.

¶ 14   Defendants asserted the following six affirmative defenses: (1) Naughton forfeited any attorney-fee claim by failing to assert the claim during or immediately following the hearing on the order of distribution and dismissal; (2) this same omission estopped Naughton from asserting his claim for fees; (3) in the absence of an attorney-client relationship between Naughton and Elizabeth or her husband, Andrew Frankenfield,[2] as guardian and/or next friend of Julianna, Naughton was barred from recovering fees; (4) if Naughton had such an attorney-client relationship, he breached his fiduciary duty to his client to fully disclose any fee-sharing

_____

[2] Andrew was named as a plaintiff in Julianna's case, along with Elizabeth, as Julianna's guardian and/or next friend, but only Elizabeth signed Pfaff's retainer agreement.

arrangement, barring him from recovering such fees; (5) Naughton could not recover fees due to his violations of Rule 1.5; and (6) if the court found that there was a joint venture between Pfaff and Naughton, Naughton violated his fiduciary duties to Pfaff by failing to disclose the fee arrangement to the clients and by failing to assert his claim before the order approving the settlement and distributing fees became final.

¶ 15    Naughton testified in his deposition as follows, in relevant part.  He met Pfaff playing golf at a country club, and Naughton probably brought up the possibility of referring cases to him.  At some later date Pfaff told him that his firm normally provided one-third of the attorney fees to the referring attorney, and Naughton said that this was fine with him.  Pfaff indicated that he would prepare the client contracts and take care of all referral issues.  Naughton called Pfaff about some cases, including Elizabeth's case.

¶ 16    Regarding Julianna's case, Naughton saw Mateljan in a social setting, and Mateljan said that his granddaughter had a potential medical malpractice issue.  He asked if Naughton still recommended Pfaff, and Naughton said that Mateljan should definitely call him.  In December 2008, Mateljan called to thank Naughton for the referral and said that the case had been settled. In the meantime, Naughton had had no interaction with the case, and he had not known that Elizabeth had hired Pfaff to represent Julianna.

¶ 17    Naughton called Pfaff and said that he wanted to congratulate him on the settlement for their mutual client.  Pfaff said that he was embarrassed because he did not know that Naughton was part of the case.  He said that he would look into the case and call him back.  Pfaff called back and apologized for not putting him on the contract as the referring attorney.  He said that he had talked to his partners, who agreed that they had to "take care of [their] good friend, Rich Naughton."  Pfaff said that he would "make it right for" Naughton.  Seven to ten days later,

Naughton and his wife attended Pfaff's firm's Christmas party. Pfaff talked about what a great settlement they had received and how easy it was. He again said that he was embarrassed for not listing Naughton as the referring attorney and that he would be sure to correct the situation.

¶ 18 We next summarize the relevant testimony from Pfaff's deposition. He met Naughton at a country club, and they talked about their work. Naughton asked if he could contact Pfaff if he ever needed a personal injury lawyer, and Pfaff agreed. At some point, Pfaff told Naughton about his firm's usual practice for referral fees. The referring attorney would receive the same percentage of fees that the firm received from the settlement or recovery, so if the firm received 20%, the referring attorney would get 20% of that 20%. The firm would include this information in the retainer agreement, and the agreement would also state that both lawyers were professionally responsible for the case. For prior cases that Naughton referred, Naughton called Pfaff, discussed the case with him, and asked if Pfaff's firm wanted to take it. Naughton received referral fees for two cases.

¶ 19 When Elizabeth called regarding Julianna's condition in January 2006, she said that she had previously talked to Pfaff regarding her own case, which he had declined. Pfaff discussed Julianna's injuries with Elizabeth and then set up a time to meet at her house. Elizabeth, Julianna, and Andrew were home; Pfaff did not believe that Mateljan was present. Pfaff was certain that no one mentioned Naughton in the initial phone call or during the meeting, and Naughton's name was not in Pfaff's notes. Only Elizabeth signed the retainer agreement, because Pfaff had not previously asked about a spouse and had not included Andrew's name on the printed contract.

¶ 20 On December 12, 2008, Naughton called, said that he heard that Julianna's case had settled, and said that he wanted to congratulate Pfaff on behalf of their mutual client. Pfaff

"almost dropped the phone." Pfaff told Naughton that he was very surprised because no one had ever mentioned Naughton's interest in the case and that he was embarrassed if Naughton had referred the case and Pfaff had not taken account of it. Pfaff said that he would review the file. When he did, he found no record of Naughton's involvement. Pfaff disputed discussing the case with Naughton at the firm's holiday party. He told Naughton in mid-January 2009 that he did not believe that Naughton was entitled to a referral fee.

¶ 21 The firm had a right to collect 22% to 30% of Julianna's settlement as a fee, but because the case had not required large expenses before settlement, the firm reduced its fee to 18% so that an extra $900,000 could go to Julianna's estate. There was "no way the fees would have been 18 percent if there'd been a referring lawyer in [the] case."

¶ 22 On December 3, 2012, defendants filed a motion for summary judgment. They argued that there was insufficient evidence to show the existence of a joint venture. They further argued that Naughton could not recover a fee, because: it would violate the rules of professional conduct; Naughton violated his common-law fiduciary duties to his alleged client; he could not prove that he had an attorney-client relationship with the Frankenfields; and if there was a joint venture, Naughton breached his fiduciary duty to defendants. Naughton countered that the trial court should deny summary judgment under *Holstein v. Grossman*, 246 Ill. App. 3d 719 (1993).

¶ 23 The trial court denied the motion for summary judgment on March 8, 2013. It stated that there were questions of material fact because: (1) there was a pattern of prior dealings with respect to referrals; (2) Naughton previously referred Elizabeth to Pfaff; (3) Elizabeth claimed that Naughton referred her to Pfaff a second time; and (4) Naughton claimed that Pfaff later admitted that he owed Naughton a referral fee, which could have ratified the agreement.

¶ 24 The trial court denied defendants' motion for reconsideration on July 9, 2013. The trial court stated that what caused it the most concern were statements by Mateljan and Elizabeth suggesting that they believed that they had a relationship with Naughton and that they disclosed this to Pfaff. The trial court stated that, further, Pfaff allegedly assured Naughton that he would take care of him, which could have implicitly ratified the existence of an agreement.

¶ 25 On October 24, 2013, the trial court granted an amended motion by defendants for certification of a question of law pursuant to Illinois Supreme Court Rule 308 (eff. Feb. 26, 2010). The certified question dealt with whether the trial court properly denied summary judgment under the facts of the case, based upon the applicable law. On February 26, 2014, this court denied the application for leave to appeal.

¶ 26 On January 20, 2015, defendants filed a second motion for summary judgment. Defendants argued that an opinion filed after the trial court's ruling on the first motion for summary judgment, *Donald W. Fohrman & Associates, Ltd. v. Marc D. Alberts, P.C.*, 2014 IL App (1st) 123351 (*Fohrman*), required a ruling in their favor as a matter of law.

¶ 27 The trial court granted the motion on March 11, 2015. It stated that *Fohrman* initially appeared distinguishable because it was resolved on the public policy of protecting a client's interest, and here the client had sided with Naughton, the referring attorney. However, the trial court stated that it must follow *Fohrman*'s clear holding that compliance with Rule 1.5 is mandatory. It therefore granted summary judgment for defendants.

¶ 28 Naughton timely appealed.

¶ 29                                    II. ANALYSIS

¶ 30 Naughton contests the trial court's grant of summary judgment in defendants' favor on his claim that Pfaff breached his fiduciary duty to Naughton arising from their joint venture.

Summary judgment is appropriate only where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Gurba v. Community High School District No. 155*, 2015 IL 118332, ¶ 10. We review *de novo* an order granting summary judgment. *Id.*

¶ 31 We begin by examining *Holstein*, the case on which Naughton primarily relies. There, the plaintiff, as part of his law practice, operated a call-in service for legal advice and referrals. *Holstein*, 246 Ill. App. 3d at 722. In his complaint, the plaintiff alleged as follows. He entered an oral referral-fee agreement with the defendants, who were an attorney and his law firm. *Id.* at 721-22. Under the agreement, the plaintiff would refer personal injury cases to the defendants in exchange for one-half of the attorney fees generated. *Id.* at 722. Further, the plaintiff would assume responsibility for the clients as if he were a partner of the firm; the defendants would make written disclosures of the referral-fee arrangement to the clients, in accordance with Rule 2-107 of the Illinois Code of Professional Responsibility (Code) (Ill. S. Ct. Code of Prof. Res. R. 2-107 (eff. July 1, 1980)); and the attorney fees would be reasonable. *Holstein*, 246 Ill. App. 3d at 722. The plaintiff drafted a model attorney-client, contract which the defendant attorney bound his firm to use. *Id.* The plaintiff referred 10 cases and received referral fees for half of them. *Id.* at 723. However, the defendants then secretly settled the remaining cases and refused to pay the plaintiff any referral fees. *Id.*

¶ 32 The plaintiff filed suit, alleging breach of contract and breach of a joint-venture agreement. *Id.* The defendants moved for summary judgment, arguing that the alleged referral agreement was illegal and unenforceable because it violated Rule 2-107—specifically, the plaintiff never had an attorney-client relationship with any of the referred individuals and never

disclosed the parties' arrangement to them prior to any referral. *Id.* The defendants further argued that the clients had never signed the model contract but rather had signed the firm's standard contingency contract, which did not disclose the parties' arrangement. *Id.* The defendants contended that, even if the plaintiff had an attorney-client relationship with the referred clients, he violated his attorney-client relationship with them by not disclosing the parties' referral-fee arrangement. *Id.* at 723-24. The defendants argued that Rule 2-107 and the plaintiff's fiduciary duty prohibited any delegation of the plaintiff's disclosure obligations. *Id.* at 724.

¶ 33 The defendants submitted affidavits of clients with large settlements, including one of Danny Flynn, stating that they had never hired the plaintiff to represent them and that no one had ever disclosed that he would share in any fee or had undertaken any responsibility for their cases. *Id.* The defendants also referred to the plaintiff's deposition testimony that he did not recall speaking to Danny. Rather, the plaintiff claimed that he had a prior relationship with Danny's brother and was retained by either him or the Flynn family and that all disclosures were made to the family. *Id.* For the other referred clients, the plaintiff believed, based solely on office procedures, that he spoke to each of them, was retained, and made full disclosures. *Id.*

¶ 34 In response, the plaintiff argued that the defendants breached their fiduciary duties to him regarding joint-venture matters by omitting him from the contingency agreements and failing to pay him. *Id.* The plaintiff argued that the defendants should be estopped from raising Rule 2-107 as a defense, because their conduct, rather than his, caused any violation of the rule. *Id.* The trial court granted summary judgment for the defendants, reasoning that the fee-sharing agreement violated Rule 2-107 and public policy because no referred client signed a writing disclosing the agreement. *Id.* at 725.

¶ 35   The appellate court affirmed the grant of summary judgment for the defendants on the breach-of-contract claim. *Id.* It began by tracing the history of Illinois ethical rules regarding fee sharing among attorneys, pointing out that the rules initially required that fees be divided proportionately to the services performed and the responsibility assumed by each attorney. *Id.* at 726-28. It noted that a case from 1981 held that fee-splitting agreements premised on client referrals were unenforceable because a contrary result would allow clients to be traded like commodities and jeopardize their best interests by making it more profitable for attorneys to sell the clients than provide legal services. *Id.* at 728-31 (citing *Corti v. Fleisher*, 93 Ill. App. 3d 517 (1981)).

¶ 36   The appellate court noted that our supreme court subsequently changed public policy when it adopted the Code, specifically Rule 2-107, which stated:

" '(a) A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm, unless

(1) the client consents in a writing signed by him to employment of the other lawyer, which writing shall fully disclose (a) that a division of fees will be made, (b) the basis upon which the division will be made, including the economic benefit to be received by the other lawyer as a result of the division, and (c) the responsibility to be assumed by the other lawyer for performance of the legal services in question;

(2) the division is made in proportion to the services performed and responsibility assumed by each, *except where the primary service performed by one lawyer is the referral of the client to another lawyer and (a) the receiving lawyer fully discloses that the referring lawyer has received or will receive*

*economic benefit from the referral and the extent and basis of such economic benefit and (b) the referring lawyer agrees to assume the same legal responsibility for the performance of the services in question as if he were a partner of the receiving lawyer;* and

(3) the total fee of the lawyers does not exceed reasonable compensation for all legal services they rendered to the client.' " (Emphasis added.) *Id.* at 732 (quoting Ill. S. Ct. Code of Prof. Res. R. 2-107 (eff. July 1, 1980)).

The *Holstein* court stated that our supreme court had moved away from prohibitions against referral-fee agreements because requiring actual participation discouraged referrals of cases that could be better-handled by other attorneys and created an incentive for referring attorneys to do unnecessary tasks, which could make legal services less efficient and more costly. *Id.* at 733. The *Holstein* court stated that, to address prior public-policy concerns, the supreme court included an enhanced consent provision and a signed-writing requirement in Rule 2-107. *Id.* at 734.

¶ 37   The court stated that in the case before it there was a fee-sharing agreement based primarily on client referrals to which no referred client ever consented in writing, so it was unenforceable in a breach-of-contract action. *Id.* at 734-35. It stated, "The client's right to counsel of his choosing must be preserved, and the signed writing requirement guarantees this result." *Id.* at 735. In response to the plaintiff's argument that the defendants should be estopped from relying on Rule 2-107 because they were supposed to obtain the signed writing, the court stated that its paramount concern was the effect of fee-sharing agreements on the clients, rather than the attorneys, and " '[i]t [did] not matter whose ox [was] gored.' " *Id.* at 737 (quoting *Schniederjon v. Krupa*, 162 Ill. App. 3d 192, 195 (1987)).

¶ 38    The court next addressed the plaintiff's claim regarding breach of fiduciary duty arising from a joint venture, stating as follows. *Id.* A jury could conclude that a joint venture existed, because the jury could find that the parties entered some enterprise, as evidenced by the referral of 10 cases from the plaintiff and checks from the defendants to the plaintiff. *Id.* at 739. The jury could also find that the enterprise was a joint venture, with the defendants contributing legal services, the plaintiff contributing clients and some responsibility for the services, and the parties equally sharing the profits. *Id.* The jury could further find that the defendants breached their fiduciary duties to the plaintiff by failing to have the clients sign the model contract, as allegedly agreed by the parties. *Id.*

¶ 39    The court stated that the lack of a signed writing under Rule 2-107 did not require that the parties' joint-venture agreement be held unenforceable on public-policy grounds. *Id.* at 740. It stated that breach-of-fiduciary-duty actions were not contract actions, so the focus was the effect of the joint-venture agreement on the attorneys involved. *Id.* It stated that public policy could not condone the defendants' alleged misconduct, because receiving attorneys could not be allowed to falsely induce referrals under the guise that the receiving attorneys would fulfill Rule 2-107's signed-writing requirement. *Id.* The court stated, "Clearly, the profession will be better served if attorneys are bound to their word." *Id.* The court further reasoned that its result satisfied Rule 2-107 because the rule did not require the referring attorney to have an attorney-client relationship with the referred clients before the referral. It stated that, instead, the rule required only that the client consent in writing to the retention of both attorneys before a fee division. *Id.* The court additionally stated that Rule 2-107 did not require the referring attorney to obtain the signed writing, but rather required the receiving lawyer to make this disclosure. *Id.* at 741. The court stated that, based on the rule's structure, the referring and receiving attorneys

could agree in advance who would be responsible for obtaining the writing, though the referring attorney might wish to do so before the referral because, without the writing, the fee-sharing arrangement would not be enforceable on contractual grounds. *Id.*

¶ 40     In a supplemental opinion on denial of rehearing, the court disagreed with the defendants' argument that its finding of unenforceability as to count I required that recovery under count II be barred as well. *Id.* It stated that the parties' alleged agreement under the breach-of-contract claim was unenforceable on public-policy grounds because it was a fee-sharing agreement to which the referred clients never consented in writing. *Id.* at 742. It stated that, in contrast, for the breach-of-fiduciary-duty claim, it needed to find only that the parties' alleged agreement initially envisioned compliance with the applicable ethical rules. *Id.* It stated that the:

"breach of fiduciary duty, which by its nature just so happens to render the underlying agreement unenforceable on public policy grounds, does not destroy the existence of the underlying agreement. It exists as do the fiduciary duties arising therefrom. Thus, a breach of fiduciary duty action may nonetheless lie." *Id.*

¶ 41     The defendants also argued that the plaintiff breached his own fiduciary duties to the referred clients, and the court agreed that the plaintiff had in fact alleged that he had an attorney-client relationship with each client before the referrals. *Id.* The court therefore agreed that the plaintiff had a fiduciary duty to disclose his referral-fee agreement to his own clients. *Id.* at 743. It found that he had not satisfied this duty as to the majority of the clients, as he did not specifically recall speaking to them. *Id.* at 745. The court found that there was a genuine issue of material fact regarding whether the plaintiff satisfied his fiduciary duty to Danny Flynn by making disclosures to his brother or other family members who were acting as authorized agents. *Id.* at 744-45. Accordingly, it reversed summary judgment as to that client only. *Id.* at 745.

¶ 42    We next set out the 1990 version of Illinois Rules of Professional Conduct Rule 1.5, as there is a disagreement here about whether that version or the 2010 version of the rules applies. The 1990 version is very similar to Rule 2-107 and states, in relevant part:

"(f) Except as provided in Rule 1.5(j), a lawyer shall not divide a fee for legal services with another lawyer who is not in the same firm, unless the client consents to employment of the other lawyer by signing a writing which discloses:

(1) that a division of fees will be made;

(2) the basis upon which the division will be made, including the economic benefit to be received by the other lawyer as a result of the division; and

(3) the responsibility to be assumed by the other lawyer for performance of the legal services in question.

(g) A division of fees shall be made in proportion to the services performed and responsibility assumed by each lawyer, *except where the primary service performed is the referral of the client to another lawyer* and

(1) *the receiving lawyer discloses that the referring lawyer has received or will receive economic benefit from the referral* and the extent and basis of such economic benefit, and

(2) the referring lawyer agrees to assume the same legal responsibility for the performance of the services in question as would a partner of the receiving lawyer.

(h) The total fee of the lawyers shall be reasonable."  (Emphases added.)  Ill. R. Prof. Conduct (1990) R. 1.5(f)-(h) (eff. Aug. 1, 1990).

¶ 43   The subsequent, 2010 version of Rule 1.5, which is currently in effect, is discussed in *Fohrman*, the case on which the trial court relied in granting summary judgment for defendants. We now turn to that case.  In *Fohrman*, the plaintiff law firm, which specialized in workers' compensation litigation, alleged in its amended complaint as follows.  It had an oral referral-fee agreement with the defendants, who specialized in personal injury litigation.  *Fohrman*, 2014 IL App (1st) 123351, ¶¶ 3, 7.  In exchange for referrals from the plaintiff, the defendants agreed to properly represent the clients; disclose the referral arrangement in accordance with applicable supreme court rules; periodically update the plaintiff on case statuses; and pay the plaintiff 50% of the attorney fees.  *Id.* ¶ 7.  The plaintiff agreed to equally share legal responsibility for the cases.  *Id.*  The plaintiff alleged that the referral agreement created a joint venture, such that the parties owed each other fiduciary duties.  *Id.*  The plaintiff alleged that over a six-year period it was paid $733,512.83 for 87 referred cases, but that it subsequently did not receive its 50% of fees on various other cases and was owed more than $100,000.  *Id.* ¶ 14.

¶ 44   The defendants argued, in relevant part, that deposition testimony showed that the plaintiff considered itself to have attorney-client relationships with the clients and that it received copies of the attorney-client agreements.  *Id.* ¶ 22.  The defendants argued that those agreements did not strictly comply with Rule 1.5 and that, since the plaintiff had notice of them and allowed them to be used, it could not recover.  *Id.* ¶¶ 21-22.  The trial court agreed with the defendants. *Id.* ¶¶ 24-25.

¶ 45   On appeal, the plaintiff, acknowledging that the attorney-client agreements did not strictly comply with Rule 1.5(e), argued that substantial compliance with the rule allowed its action to proceed because the parties were engaged in a joint venture.  *Id.* ¶¶ 30, 36-37.  The

appellate court stated that it would consider the argument under the rule as it currently existed. *Id.* ¶ 32. It looked at the version of Rule 1.5(e) that became effective in 2010, which provided:

> " '(e) A division of a fee between lawyers who are not in the same firm may be made only if:
>
> > (1) the division is in proportion to the services performed by each lawyer, or if the primary service performed by one lawyer is the referral of the client to another lawyer and each lawyer assumes joint financial responsibility for the representation;
> >
> > (2) the client agrees to the arrangement, including the share each lawyer will receive, and the agreement is confirmed in writing; and
> >
> > (3) the total fee is reasonable.' " *Id.* ¶ 34 (quoting Ill. R. Prof. Conduct (2010) R. 1.5(e) (eff. Jan. 1, 2010)).

The court stated that "joint financial responsibility" meant that each lawyer assumed financial responsibility for the representation as a whole, as if the lawyers were associated in a general partnership. *Id.* The court stated that Rule 1.5 represented this state's public policy to elevate the rights of the clients above the lawyers' remedies in seeking to enforce fee-sharing agreements. *Id.* ¶ 35. After reviewing a series of cases, the court held that Rule 1.5(e) required strict compliance and that without such compliance the plaintiff could not recover. *Id.* ¶ 44.

¶ 46 The court stated that *Holstein*'s determination that a client did not have to be informed of the fee agreement before a referral appeared to be based on Rule 2-107's language stating that the receiving lawyer had to disclose that the referring lawyer would receive an economic benefit. *Id.* ¶ 53. The court said that such language was not present in the 2010 version of Rule 1.5; instead, Rule 1.5 did "not place the responsibility of disclosure solely on the receiving attorney,

and provide[d] the disclosure must be made that the referring attorney *will* receive the fee." (Emphasis in original.) *Id.* The court stated that *Holstein*'s holding regarding joint-venture claims arguably was no longer viable, because it was grounded on Rule 2-107's plain language rather than that of Rule 1.5. *Id.* ¶ 54. The court additionally stated that that holding was inconsistent with *Holstein*'s own decision on the breach-of-contract count and its refusal to enforce an agreement that violated public policy, as well as with holdings in later cases. *Id.* The court went on to state that, even if this limited " 'exception' " to the standard of strict compliance still had a foundation, it would not apply in the case before it, because the plaintiff had attorney-client relationships with the referred clients, meaning that it had a duty to ensure that they were informed of the referral agreement. *Id.* ¶ 55. The court noted that the plaintiff had notice of the noncompliant attorney-client agreements but still allowed them to be used, contrary to Rule 1.5 and its common-law fiduciary duty. *Id.* The court went on to state that it would not find that the agreements substantially complied with Rule 1.5(e), because they did not inform the clients (1) of the fee-sharing agreement based on referrals, (2) of the exact division of fees, and (3) that the parties had assumed equal financial responsibility. *Id.* The court concluded that, because there was not strict compliance with Rule 1.5(e) and because the plaintiff failed to satisfy its own fiduciary duty to disclose the referral agreement, the referral agreement and related liens were unenforceable. *Id.* ¶ 56.

¶ 47 Naughton argues that the instant case is on all fours with *Holstein*, in that a jury could find that there was a joint venture between the parties based on evidence that: the parties had an oral referral agreement; Naughton referred eight potential clients to Pfaff over seven years; Pfaff accepted three of the referrals, had those clients sign written contracts that complied with Rule 1.5, and paid Naughton the agreed-upon referral fee; and Naughton agreed to assume the same

legal responsibility for the services Pfaff rendered to the referred clients as if Naughton were one of Pfaff's partners, as shown by the written contracts in the cases Pfaff accepted. Naughton maintains that a jury could also conclude that Pfaff breached his fiduciary duties to Naughton based on evidence that Pfaff was told of Naughton's referral prior to accepting Julianna's case but did not give Elizabeth a contract that mentioned Naughton and disclosed the fee agreement. Naughton contends that Pfaff's subsequent apologies to him, which must be construed as admissions at the summary-judgment stage, are consistent with that conclusion and further support his claims against defendants.

¶ 48    Naughton argues that, as in *Holstein*, the fact that Elizabeth did not sign a written contract complying with Rule 1.5 does not preclude enforcement of the parties' joint-venture agreement. Naughton notes that the *Holstein* court stated that, in contrast to breach-of-contract claims, the "paramount concern" in a breach-of-fiduciary-duty action is the effect of the agreement on the attorneys involved. *Holstein*, 246 Ill. App. 3d at 740. Naughton argues that, in this regard, Pfaff cannot be rewarded for his misconduct in this case, as a matter of public policy.

¶ 49    Naughton maintains that this case is distinguishable from *Fohrman* because he did not allege the existence of an attorney-client relationship with Elizabeth before he referred her to Pfaff. Therefore, according to Naughton, he did not have an independent duty to ensure that she was advised of the referral agreement. Naughton argues that, even if he had such a duty, Elizabeth testified that she was aware that he had referred her to Pfaff and that her contract should have included Naughton. Naughton argues that this situation is distinguishable from *Fohrman* also because he believed that Pfaff would present Elizabeth with a contract that complied with Rule 1.5, as Pfaff had done with other referrals, and as was the situation in *Holstein*. He argues that in *Fohrman*, in contrast, the referring attorney knew that the contracts

that the receiving attorney was using did not comply with the rule, yet he continued to allow them to be used.

¶ 50    Naughton recognizes that *Fohrman* labeled as inconsistent *Holstein*'s different results for the breach-of-contract claim and the joint-venture claim, stating that the holding might no longer be viable due to changes in Rule 1.5.  Naughton points out that *Fohrman* could not overrule *Holstein*.  See *In re Marriage of Gutman*, 232 Ill. 2d 145, 149 (2008) (one panel, division, or district of the appellate court cannot overrule another).  He further argues that the *Holstein* court's reasoning was sound, in that a breach-of-contract claim for a fee-sharing agreement cannot be enforced absent strict compliance with Rule 1.5, because the client's rights are of primary concern.  Naughton argues that, in contrast, a breach-of-fiduciary-duty claim does not involve the client but rather involves the fiduciary duty one attorney owes the other upon entering a joint-venture agreement.  Naughton argues that *Fohrman*'s public-policy concerns are also not at issue in this case. Specifically, enforcing the fee-sharing agreement here would not subvert the client's rights but rather would give effect to the client's original intentions, as Elizabeth confirmed that her contract with Pfaff should have included Naughton.

¶ 51    Naughton notes that the current version of Rule 1.5, which became effective in 2010, is silent as to which attorney should obtain the signed writing required by the rule.  See *supra* ¶ 45 (quoting *Fohrman*, 2014 IL App (1st) 123351, ¶ 34, quoting Ill. R. Prof. Conduct (2010) R. 1.5 (eff. Jan. 1, 2010)).  Naughton argues that, although he believes that the 1990 version of Rule 1.5 should apply, the 2010 version is even more consistent with *Holstein* in that, whereas the prior rule clearly put the onus of disclosure on the receiving attorney, the current rule does not say which attorney has the obligation, thus leaving it to the parties to decide.  Naughton argues that, therefore, our result should not differ regardless of which version of the rule applies.

¶ 52    Defendants argue that under *Fohrman* the current version of Rule 1.5 applies, which requires that all fee-sharing agreements be in writing, with the client's written consent, and that each lawyer assume joint financial responsibility for the representation.  Defendants argue that *Fohrman* correctly distinguished *Holstein* on the basis that former Rule 2-107 required that the receiving lawyer disclose the benefit whereas the 2010 version of Rule 1.5 does not contain that language.  Defendants also argue that *Fohrman* correctly concluded that *Holstein*'s exception for certain joint-venture claims was inconsistent with its breach-of-contract analysis and with later cases holding that strict compliance with Rule 1.5 was required.  See *Fohrman*, 2014 IL App (1st) 123351, ¶ 54.

¶ 53    Defendants argue that *Holstein* is a remnant of old cases requiring less than strict compliance with the rules of professional conduct.  Defendants further argue that the portion of *Holstein* on which Naughton attempts to rely, relating to the referral of non-clients, was rendered *dicta* by the court's supplemental opinion stating that the plaintiff did claim to have attorney-client relationships with the individuals.  Defendants argue that Naughton takes the extraordinary position that he did not have an attorney-client relationship with the Frankenfields, so as to avoid the requirement that an attorney has a fiduciary duty to disclose referral fees to the client, but even this would only place him within *Holstein*'s *dicta* regarding non-clients.  Defendants maintain that, even then, *Holstein*'s analysis of this issue is not persuasive, because it relied on a Kansas case interpreting a rule with significantly different language.  See *Holstein*, 246 Ill. App. 3d at 740 (citing *Ryder v. Farmland Mutual Insurance Co.*, 807 P.2d 109 (Kan. 1991)).  Defendants argue that, in contrast, the necessity of an attorney-client relationship is axiomatic, citing *Phillips v. Joyce*, 169 Ill. App. 3d 520 (1988).  There, in discussing another case, the court stated that, because the plaintiff apparently never had an attorney-client relationship with the

clients, he was not entitled to a referral fee. *Id.* at 529. Defendants argue that this result is supported by Rule 1.5's language, as it refers to a situation in which "the primary service performed by one lawyer is the *referral of the client* to another lawyer." (Emphasis added.) Ill. R. Prof. Conduct (2010) R. 1.5(e) (eff. Jan. 1, 2010).

¶ 54    Defendants argue that an even more fundamental criticism of *Holstein*'s analysis is that the court relied on Rule 2-107(a)(2) and did not consider Rule 2-107(a)(1) (see *supra* ¶ 36), which sets up the foundational requirement of a writing signed by the client and does not distinguish between the referring and receiving lawyers, making the disclosures equally binding upon both. Defendants cite *Thompson v. Hiter*, 356 Ill. App. 3d 574 (2005), where the court stated that both parties involved "would be subject to the requirements of Rule 1.5(f) that when lawyers entered into a fee-sharing arrangement, they must disclose the terms of the fee-sharing arrangement and obtain the clients' consent thereto in a written agreement" (*id.* at 589-90), and the parties' "failure to comply with Rule 1.5(f) preclude[d] enforcement of any oral fee-sharing agreement" (*id.* at 590).

¶ 55    Defendants maintain that the fact that Elizabeth supports Naughton's claim for a referral fee does not excuse compliance with Rule 1.5. Defendants cite *In re Storment*, 203 Ill. 2d 378, 398 (2002), where the court found that a client's knowledge of the fee terms and approval of the fee after the work was done was not sufficient to comply with Rule 1.5. The court reasoned that the client might be placed in a situation where he or she has to either rely on the attorney's recollection of the fee agreement or suffer a delay in receiving the litigation's proceeds pending resolution of the fee dispute. Defendants point out that, here, Naughton never met with the Frankenfields, did not know that Elizabeth retained Pfaff, never contacted Pfaff about the case, and did not advise Elizabeth that he wished to claim a fee until after the case was settled.

Defendants note that in her deposition Elizabeth stated that she did not know how the referral in this case was specifically supposed to work or what percentage of the fee Naughton was to receive. Defendants assert that Elizabeth's ignorance was caused by Naughton's failure to disclose and speaks to the courts' concerns about protecting the clients' interests.

¶ 56 We first note that, as this case was at the summary-judgment stage, we must take as true for purposes of our analysis that Naughton and Pfaff had an oral fee-sharing agreement; that Elizabeth initially told Pfaff that Naughton had referred her for Julianna's case; and that Pfaff later told Naughton that he was embarrassed for not listing him as the referring attorney and would "make it right."

¶ 57 We next address which version of Rule 1.5 applies. Elizabeth met with Pfaff regarding Julianna's case in 2006 and Pfaff denied any payment to Naughton in 2009, so all relevant events occurred before the 2010 version of Rule 1.5 became effective. Still, *Fohrman* applied the current version of the rule retroactively, citing *Paul B. Episcope, Ltd. v. Law Offices of Campbell & Di Vincenzo*, 373 Ill. App. 3d 384 (2007). *Fohrman*, 2014 IL App (1st) 123351, ¶ 32. *Episcope* cited *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 481 (1998), where a supreme court rule was applied retroactively based on the maxim that the law cannot enforce a contract that it prohibits based on public policy. *Episcope*, 373 Ill. App. 3d at 394.

¶ 58 In determining whether a supreme court rule applies retroactively, we follow the rule's expressed intent regarding retroactivity, if any. *In re Marriage of Duggan*, 376 Ill. App. 3d 725, 728-29 (2007). Otherwise, we apply procedural laws or changes retroactively, but not substantive laws or changes. *Id.* at 729. Procedural laws relate to pleadings, evidence, and practice, and these laws will apply retroactively unless they will impair a vested right that is so perfected, complete, and unconditional that it can be equated with a property interest. *Id.* In

*Dowd & Dowd*, 181 Ill. 2d at 481, the supreme court applied a rule of professional conduct retroactively to a contract entered into prior to the rule's effective date, reasoning that to otherwise enforce the contract would violate the public-policy considerations underlying the prohibition found in the rule.

¶ 59    The above analysis shows, at a minimum, that supreme court rules are not applied retroactively as a matter of course.  The changes to Rule 1.5 from the 1990 version to the 2010 can be labeled as substantive, as they affect an attorney's professional obligations regarding fees, as opposed to the conduct of court proceedings.  Further, the portion of the rule relevant here cannot be said to have significantly changed public policy to the extent that the prior version cannot be applied, as they both have the same basic disclosure requirements for attorney fee-sharing agreements.  Compare Ill. R. Prof. Conduct (1990) R. 1.5 (eff. Aug. 1, 1990), with Ill. R. Prof. Conduct (2010) R. 1.5 (eff. Jan. 1, 2010).  Accordingly, we apply the 1990 version of Rule 1.5 in this case.  We interpret supreme court rules in the same manner as statutes, with the goal of ascertaining and giving effect to the intent of the rule's drafters.  *In re Storment*, 203 Ill. 2d at 390.  The most reliable indicator of that intent is the language the drafters used, when given its plain and ordinary meaning.  *People v. Salem*, 2016 IL 118693, ¶ 11.

¶ 60    Looking at the language of the 1990 version of Rule 1.5 (see *supra* ¶ 42), we disagree with defendants that the rule's plain language requires that the referring attorney have an attorney-client relationship with the referred individual prior to the referral.  That is, while the rule states that fees may not be divided "unless the *client* consents to employment of the other lawyer," and the rule discusses the situation where "the primary service performed by one lawyer is the referral of the *client* to another lawyer" (emphases added) (Ill. R. Prof. Conduct (1990) R. 1.5(f)-(g) (eff. Aug. 1, 1990)), "client" can be understood to mean the individual who becomes

the client of the receiving lawyer. While there might be unexplored public-policy reasons for requiring that an attorney first have an attorney-client relationship with an individual before a referral, such a result is not mandated by the rule's language itself.

¶ 61 We now examine who has disclosure obligations under the rule. Naughton does not dispute *Fohrman*'s determination that Rule 1.5 requires strict compliance, as opposed to partial compliance. *Fohrman*, 2014 IL App (1st) 123351, ¶ 44. However, he argues that the 1990 version of Rule 1.5 requires the receiving attorney to make the relevant disclosures. We recognize that subsection (g) requires that the "receiving lawyer disclose[] that the referring lawyer has received or will receive economic benefit." Ill. R. Prof. Conduct (1990) R. 1.5(g) (eff. Aug. 1, 1990). However, subsection (f), which requires that the client sign a writing in the first place, does not put this burden solely on the receiving attorney. Ill. R. Prof. Conduct (1990) R. 1.5(f) (eff. Aug. 1, 1990). Thus, it appears that both attorneys would be ethically obligated to ensure that the client agrees in writing to a fee division. This is especially true when considering that subsection (h), requiring that the "total fee of the lawyers shall be reasonable," would clearly apply to both attorneys. Ill. R. Prof. Conduct (1990) R. 1.5(h) (eff. Aug. 1, 1990); see also *Daniel v. Aon Corp.*, 2011 IL App (1st) 101508, ¶ 22 (where all parties to a fee arrangement were attorneys, their conduct was subject to the Illinois Rules of Professional Conduct).

¶ 62 Naughton argues that the attorneys could decide ahead of time who would take on the disclosure obligations. *Thompson*, one of the cases on which defendants rely, is relevant to this question. There, an attorney and his firm had an oral contract that the firm would receive two-thirds of any fees the lawyer generated during his employment. *Thompson*, 356 Ill. App. 3d at 576. A client signed a contingency-fee agreement with the firm and attorney, but the contract did not disclose the fee-sharing agreement. *Id.* at 589-90. After the lawyer left the firm, the

client discharged the firm and continued to retain the attorney. Upon the resolution of the client's case, the attorney sought to resolve the firm's lien, which sought two-thirds of the fees. *Id.* at 576-77. The appellate court found that the firm and the attorney had been involved in a joint venture as to the client's representation, but this did not mean that the firm was entitled to fees pursuant to the fee-sharing agreement after it was discharged, as the fee-sharing agreement did not comply with Rule 1.5(f). *Id.* at 589-90. The court stated that the "Rules of Professional Conduct apply to all claims for fee sharing, regardless of whether the claim is asserted against the client or another attorney" (*id.* at 590), that both parties "would be subject to the requirements of Rule 1.5(f) that when lawyers entered into a fee-sharing arrangement, they must disclose the terms of the fee-sharing arrangement and obtain the clients' consent thereto in a written agreement" (*id.* at 589-90), and that the parties' "failure to comply with Rule 1.5(f) preclude[d] enforcement of any oral fee-sharing agreement" (*id.* at 590).[3]

¶ 63    We recognize that *Thompson* presented a somewhat different situation in that it involved an attorney and his firm, rather than referring and receiving attorneys. However, the court clearly stated that Rule 1.5(f) applied to both parties, which, as discussed, is supported by the rule's structure. In other words, even though Rule 1.5(g) gives the receiving attorney an obligation to disclose the amount of money the referring attorney has received or will receive, it does not remove the obligation of all involved attorneys under Rule 1.5(f) to ensure that the client has signed a written document including such disclosures. Thus, Naughton's failure to

---

[3] *Thompson* noted that a discharged attorney may be compensated for the services rendered before the discharge, on a *quantum meruit* basis. Here, Naughton did not perform any legal services on Julianna's case, so *quantum meruit* is not implicated.

ensure that Elizabeth signed a written fee-sharing agreement precludes him from recovering on the oral fee-sharing agreement with Pfaff.

¶ 64    We recognize that the application of *Holstein* to this situation would lead to a different result, because the substance of Rule 2-107 is very similar to that of the 1990 version of Rule 1.5.  Compare Ill. S. Ct. Code of Prof. Res. R. 2-107 (eff. July 1, 1980) with Ill. R. Prof. Conduct (1990) R. 1.5 (eff. Aug. 1, 1990).  However, we agree with *Fohrman* that the attorneys' fee-sharing agreement cannot be enforced without the client's signed consent, whether the referring attorney seeks to recover his or her share of the fees under a breach-of-contract theory or a breach-of-fiduciary-duty theory arising from a joint venture.  *Holstein* attempted to distinguish the two causes of action by stating that it could not enforce a fee-sharing agreement to which the client never consented in writing, but that it could compensate an attorney for a breach of fiduciary duty arising from that agreement.  See *Holstein*, 246 Ill. App. 3d at 742.  However, as *Fohrman* stated, Rule 1.5 as a whole embodies this state's public policy of prioritizing clients' rights over lawyers' remedies in seeking to enforce fee-sharing agreements.  *Fohrman*, 2014 IL App (1st) 123351, ¶ 35.  We agree with *Fohrman* that *Holstein*'s attempt to distinguish breach-of-contract and breach-of-fiduciary-duty claims arising from the same fee-sharing agreement is inconsistent with the strict-compliance standard set forth in case law and with the public policy behind Rule 1.5.  See *id.* ¶ 54.  Moreover, as defendants point out (see *supra* ¶ 54), the *Holstein* court took the position that its result for the breach-of-fiduciary-duty claim was compatible with Rule 2-107 because the rule required only the receiving lawyer to disclose the fee division to the client.  *Holstein*, 246 Ill. App. 3d at 741.  In doing so, *Holstein* relied only on language in Rule 2-107(a)(2) and did not account for the fact that Rule 2-107(a)(1), which set forth the foundational requirement that the client consent in writing to a fee division, did not distinguish between

receiving and referring attorneys, making the requirement equally binding upon both.  In sum, Naughton sought to recover his share of the fees from Julianna's case through a claim of breach of fiduciary duty, but as these damages stem from a fee-sharing agreement that was subject to Rule 1.5 but not in compliance with the rule, Naughton's claim must fail.

¶ 65    That Elizabeth agrees that Naughton should obtain a portion of the fees as the referring attorney does not change our result, especially considering that she was completely unaware of how the fees were to be divided.  In *In re Storment*, our supreme court stated that a writing detailing the fee arrangement "ensures that the scope and terms of each lawyer's representation are defined, thus preventing or minimizing uncertainties and disputes."  *In re Storment*, 203 Ill. 2d at 398.  The supreme court found that a client's general understanding that both attorneys would be compensated for their services did not fulfill the rule's mandatory writing requirement.  *Id.*  The fee arrangement had to be disclosed before the work was done, to avoid a potential inequality of bargaining power between the attorney and the client.  *Id.*  The potential pitfalls of a lack of a written fee-division disclosure can be illustrated by this case, most obviously as the root of the instant litigation.  Further, we note that Elizabeth supported a referral fee for Naughton as long as it would not cost her or Julianna's estate any money.  However, Pfaff testified in his deposition that his firm had voluntarily reduced their attorney fees to 18% of the settlement, which it would not have done had there been a referring attorney involved.  We do not take this statement as true for purposes of summary judgment, but we mention it to illustrate the concrete effects that a fee-division arrangement can have on the clients themselves, further supporting the long line of cases requiring that clients affirmatively consent in writing to fee divisions.  See also *Woods v. Southwest Airlines, Co.*, 523 F. Supp. 2d 812, 822 (N.D. Ill. 2007) ("a client demonstrates whether the fee arrangement is in his or her best interest by consenting to

it, not consenting to it, or changing his or her mind about consenting to it").  Under Rule 1.5, the obligation to ensure that the client signed such a disclosure could not be delegated to Pfaff alone, and the lack of the signed disclosure precludes Naughton from recovering under the alleged fee-sharing agreement underlying his breach-of-fiduciary-duty claim.  Accordingly, the trial court correctly granted summary judgment for defendants.

¶ 66                                III. CONCLUSION

¶ 67     For the reasons stated, we affirm the judgment of the McHenry County circuit court.

¶ 68     Affirmed.

¶ 69     JUSTICE HUTCHINSON, specially concurring.

¶ 70     I write separately not to dispute the application of Illinois Rule of Professional Conduct 1.5(f) (eff. Aug. 1, 1990). I agree with the *Fohrman* court that Rule 1.5 is a clear statement of public policy concerning fee splitting and also that it demands strict compliance. *Fohrman*, 2014 IL App (1st) 123351, ¶ 45.  Therefore, I concur with the majority's opinion.

¶ 71     I write separately, however, to address the conduct of attorney Bruce R. Pfaff. In his affidavit, he denied in his conversations with Elizabeth concerning the injury to her daughter in 2007 any reference to a referral from attorney Naughton.  Yet, Elizabeth and her father consulted with Pfaff several years earlier, and were referred to Pfaff *by Naughton*.  I think it highly unlikely then that Naughton, who introduced Pfaff and Elizabeth, somehow did not come up in the 2007 client consultation.  Furthermore, Elizabeth, her father, and Naughton all testified about conversations in 2007 and 2008 with Pfaff about the case that ultimately settled for $7.9 million. Elizabeth and her father both indicated that they had been referred to Pfaff by Naughton. Elizabeth further testified that she would not have considered hiring Pfaff *without* the referral from Naughton.  Finally, Naughton testified that, after he became aware of the settlement, he had

at least two conversations with Pfaff wherein Pfaff said that he was embarrassed by the situation and that the firm's "good friend, Rich Naughton," would be "take[n] care of."

¶ 72    This case was not decided on the credibility of the witnesses, and in my opinion, Pfaff is fortunate that the *Fohrman* case was decided while this case was still pending in the trial court. Whether the failure to include the referral language in the retainer agreement was an innocent oversight or an intentional act with the hope that Naughton would never hear about the settlement is not important for purposes of this disposition. However, in view of the history between the attorneys here and the prior acknowledged referral of Elizabeth in 2003, Pfaff's convenient memory that he never talked to anyone about a referral from Naughton in 2007 runs afoul of the direction of the appellate court that "[a]ttorneys should act reasonably towards each other." *Episcope*, 373 Ill. App. 3d at 396.

¶ 73    I would add another direction to lawyers, and in doing so, remind them of every speech that I have ever heard when I have been privileged to participate in the swearing-in ceremonies for new attorneys. The practice of law is an honorable and revered profession. It is not a battlefield where knights in not-so-shining armor, when they are fortunate enough to recover funds on a client's behalf, should refuse to share their prize with justly deserving colleagues as if they all were knaves. As Illinois Supreme Court Justice Robert R. Thomas, my former colleague on the Second District Appellate Court, often says in his remarks to newly minted attorneys, "a lawyer's word is his or her most valuable asset." Unfortunately, these reminders have come too late for an honorable resolution in this case.